[No. S004381. Crim. No. 22040. Dec. 22, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
JOE EDWARD JOHNSON, Defendant and Appellant.

578

COUNSEL

Robert R. Bryan, under appointment by the Supreme Court, and Thomas W. Jackson for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Daniel J. Kremer and Steve White, Chief Assistant Attorneys General, Arnold O. Overoye, Assistant Attorney General, Charles P. Just, Roger E. Venturi, Gregory W. Baugher, Jane N. Kirkland, Ward A. Campbell and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PANELLI, J.**—Defendant Joe Edward Johnson was convicted of the first degree murder of Aldo Cavallo (Pen. Code, § 187),[1] of the forcible rape of Mary S. (§ 261), and of related offenses as to each incident. Special circumstance allegations that the murder was committed while defendant was engaged in the commission of robbery and burglary (§ 190.2, subd. (a)(17)(i) and (vii)) were found to be true. The judgment of death was entered under the 1978 death penalty law (§ 190.1 et seq.). The appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

For reasons hereafter stated, we reverse the judgment as to the rape under compulsion of *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 641 P.2d 775]; we affirm the judgment as to the murder; and we reverse the penalty under compulsion of *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430].

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## I. FACTS

### A. *Prosecution Case.*

#### 1. *The Murder.*

On Thursday, July 26, 1979, the body of Aldo Cavallo was discovered in his Santa Rosa condominium. The body was on the bed, lying under tightly tucked blankets pulled up to the chin, entirely covered by the bedspread. The pillow was covered with blood and brain matter. It was determined that the injuries to the head were the cause of death. A barbell was found at the foot of the bed. Cavallo's blood type was found on the barbell.

It was determined that the crime occurred during the evening of Tuesday, July 24, 1979. A neighbor, Jackie Wilkey, gave a description of a suspect. She testified that on Tuesday evening, about 10 p.m., she noticed a man standing outside her apartment. When she attempted to approach him, the man ran between the buildings. The man was tall, over six feet, with hair "very close on the sides and . . . higher on the top." She thought the man "possibly" was a Black person.

Investigators found a window open in Cavallo's apartment. A nearby door, which could be opened by reaching through the window, was unlocked. A screen, apparently taken from the open window, was leaning against a patio chair. A fingerprint was obtained from the screen. A prosecution expert identified it as matching defendant's right thumbprint.[2]

Although Cavallo was described as a "very neat housekeeper," his apartment was in shambles. Closet doors and drawers were open, and items were strewn throughout. A television set was on the floor of the hallway. A second television set was missing. Police found the purchase receipt and other documents for a Bohsei color television set and were able to locate the serial number through the warranty registration, which had been sent to the manufacturer. The television was later located in defendant's residence, as a result of a search conducted August 9, 1979, pursuant to a parole search condition.

---

[2] The identification was made by Angelo Rienti, a latent print analyst with over 26 years of experience with the California Department of Justice. In initial tests done by Roy Fain, a patrolman of the Santa Rosa Police Department who had "processed" the murder scene, the officer was unable to form an opinion as to the match of defendant's fingerprints and the latent print from the screen; after receiving some information from the Criminal Identification and Information Branch he "zeroed in on the right thumbprint." The record is silent as to his conclusions.

A friend of Cavallo told the police that Cavallo kept a handgun in his nightstand "for protection." No handgun was located. However, two boxes of Monark .22-caliber cartridges were found on the dining room table, and in an adjacent hall investigators found two shotguns, a shotgun case, and three boxes of shotgun shells. Based on the inscriptions on the boxes of cartridges, an expert for the prosecution testified that the Monark cartridges were packaged in April 1952; Monark was a brand name of Federal Cartridge Company until 1963; the cartridges themselves were manufactured until 1973. The prosecution also presented testimony that Cavallo had owned a .22-caliber High Standard handgun that looked like a Field King or Sport King model.

### 2. The Rape.

On Saturday, July 28, 1979, as Mary S. knelt at prayer in church, she was approached by a "tall Black man" who asked her where the priest was. She directed him to the priest's house. The man walked away, but turned and came back, opened his jacket, revealing a handgun, and said, "keep quiet now and you won't get hurt." He directed her to the back of the church and into a bathroom.

The assailant fired the gun into the toilet and ordered Mary to take off her pants. He had intercourse with her. After ordering her to put her pants on, he asked for money, grabbed her purse, looked through it, and gave it back to her. He also told her to put her sweater over her head "so you don't see me." She did so.

Mary next recalled "groping around the pews," feeling "excruciating pain in her head." She was assisted by Betty Jane Kropp to the priest's house and to the hospital. There it was determined that Mary had received extensive head injuries which could have been caused by blows from the butt of a pistol.

Mary remained in the hospital for six days. Before her release she was shown several photographs, including a black-and-white double view of defendant. Mary could identify none of the photos as that of her assailant.

Later, Mary assisted in the preparation of a composite drawing of her assailant. In addition to describing him as a tall Black man, she remembered that he had a "scraggly type beard." To assist her in recalling the appearance of her assailant, on August 14, 1979, Mary was hypnotized by a police officer. The next day, on August 15, she attended a lineup. The persons in the lineup were asked to speak. Mary identified defendant, who

was cleanshaven, as her assailant. At the preliminary hearing and at trial, she again identified defendant as her assailant.

Ms. Kropp, who had assisted Mary, testified that she had noticed a tall (over six feet) Black man come through the door and approach Mary. She initially thought the man was a parishioner. She could not tell whether he had a beard and was unable to identify defendant from photographs shortly after the assault. She did not recognize him at trial.

At the rape scene, authorities found various pieces of the handgun apparently used in striking the victim. A gun clip containing eight cartridges was located. The words "High Standard" were imprinted on the bottom of the clip. Such a clip normally holds eight cartridges, along with the one in the chamber of the weapon. A shell casing was also found at the scene, and it was evident that a bullet had been shot through the toilet.

Six of the cartridges in the clip and the spent casing were later identified as Monark .22's, manufactured by Federal Cartridge Company and struck by the same die or dies as those found in Cavallo's residence. A fingerprint was later obtained from the clip. Though expert witnesses for the prosecution and defense differed on whether the print was sufficiently legible for identification, the prosecution expert testified that it matched defendant's right thumbprint.

Also found at the scene were a slide lock, slide lock spring, safety, front sight, and plastic parts of the grip of a handgun. These parts were consistent with having come from either a Field King or Sport King model High Standard .22-caliber handgun.

Gerald Cardoza, defendant's parole officer, testified that he last visited defendant on Thursday, July 26, 1979. Defendant had "hair on his face, he had sideburns, weren't really filled in all the way, and a little bit of hair on his chin." His hair "was longer than it is now, particularly on top," and "shorter on the sides and longer, kind of swept back." Defendant's facial hair extended "kind of like a mutton chop sideburn would be."

B. *The Defense Case.*

Defendant did not take the stand. His defense was alibi. Defendant's wife, a registered nurse employed at Sonoma State Hospital, testified that defendant took her to work at 6:30 a.m. on July 24, 1979, met her for lunch between 11 and 12, and picked her up after work at 3 p.m. Defendant was at home with his wife until 6:30 a.m. the next morning, when he again took her to work. On Friday defendant took his wife to work at 6:30 a.m. and

picked her up at 11 a.m. When defendant met his wife at 11 a.m., she noticed that he had shaved his goatee and sideburns. Defendant took his wife to work at 6:30 a.m. Saturday morning, July 28, 1979. The couple spoke on the telephone at 7 a.m. and 10 a.m. Defendant met his wife for lunch between 11 and 12, and picked her up after work at 3 p.m.

Defendant's wife also testified that an acquaintance had sold defendant the Bohsei television later seized from their residence and identified as having belonged to Aldo Cavallo.

The defense presented evidence of third-party guilt on the rape charges. A witness testified that on Sunday, July 29, 1979, she was raped and beaten in Spring Lake Park in Santa Rosa. She identified her assailant as tall, heavy, and Black, with a small beard and arms that appeared to have been recently scratched. At the San Francisco lineup held August 15, 1979, the witness identified someone other than defendant; and at defendant's trial, she testified that defendant was not the man who raped her.

Bruce Cooper was arrested on Monday, July 29, 1979. He carried a handgun, a Sports King High Standard, on which the hand grips were missing. Cooper stated that he had purchased the gun the day before from a Black man named John. Cooper described John as about 40 years of age, 6 feet tall, weighing about 170 pounds, and with a Fu Manchu type mustache and gruff hair on his chin but not on the sides of his face. Cooper testified that defendant was not the person who sold him the gun.[3]

The defense also called a professor of psychology who testified regarding human perception and memory: Stress affects perception, and extreme stress diminishes memory; violence can cause retrograde or anterograde amnesia; and people have more difficulty identifying members of a race different than their own.

Finally, although defendant did not testify, he did take the stand to try on a left-hand black glove which the police had found on the floor near Cavallo's front door. It did not fit well—it was short and tight.

### C. *Verdict.*

In connection with the killing of Cavallo, defendant was convicted of first degree murder, burglary, and robbery, with personal use of a deadly or

---

[3] Criminalist Richard Waller, a prosecution witness who had test fired the weapon, testified that the spent casing found at the church had not been fired from the Cooper weapon. Gunsmith Murphy Delany testified for the defense that Cooper's handgun had a broken firing pin, which could change the impression left on any fired casing.

dangerous weapon, a barbell. The burglary and robbery felony-murder special-circumstance allegations were found to be true. Defendant was convicted of the forcible rape of Mary and in connection with that incident was also convicted of assault with intent to commit murder. Defendant was acquitted of assault with a deadly weapon, with which he was charged in connection with the rape. Allegations of prior convictions had been admitted by defendant, namely, assault with intent to commit murder, battery upon a person not a prisoner, and escape by violence. The jury imposed the death penalty.

## II. Guilt Phase Issues

### A. *Severance.*

Section 954 provides in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . [or] different offenses of the same class of crimes or offenses, under separate counts . . . provided, that the court . . . in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts . . . be tried separately. . . ."

■ Defendant contends that the trial court abused its discretion in refusing to grant his motions for severance of the murder and rape charges, arguing that the offenses were neither of the same class nor connected together in their commission or, alternatively, that severance was required in the interests of justice.

■ The joinder was proper—murder and rape are assaultive crimes against the person (*People* v. *Poggi* (1988) 45 Cal.3d 306 [246 Cal.Rptr. 886, 753 P.2d 1082]) and, as such, are "offenses of the same class" (*People* v. *Rhoden* (1972) 6 Cal.3d 519, 524-525 [99 Cal.Rptr. 751, 492 P.2d 1143]; *Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 129, 135 [172 Cal.Rptr. 86]). The remaining charges against defendant—robberies, assaults, and burglary—are all either of the same class or "connected together in their commission" within the meaning of section 954. Accordingly, since the statutory requirements for joinder are clearly met in this case, defendant can predicate error only on a clear showing of potential prejudice. (*Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699].)

■ In his first severance motion defendant argued that even if the charges were properly joined, the mere presence of the rape charge, evidence of which would be inadmissible under section 1101 of the Evidence Code during a trial of the homicide alone, would intolerably prejudice his

right to a fair trial.[4] The state opposed the motion on grounds the rape and murder took place within a period of four days and, under subdivision (b) of Evidence Code section 1101, the evidence found at the rape scene was admissible to supply a motive for killing Cavallo and also proved the identity of the killer.

The trial court denied the severance motion on the basis of the evidentiary connection between the rape and the murder. The court stated: "If there were no common connecting links between the two basic charges, strong arguments could be made that the charges must be tried separately. However, it is very clear that there is a highly important connecting link between the rape and murder charges. In the Court's view, it is inevitable that any jury trying this case will become acutely aware that the defendant is charged with both rape and murder. Separation of the two basic charges and their respective collateral charges would be an idle act."

Defendant renewed the severance motion after venue was transferred to Sacramento County, arguing that his change of plea to the murder count (to not guilty by reason of insanity) warranted another look at severance, since there was a possibility of inconsistent defenses. The trial court found no changed circumstances warranting severance.

■ In evaluating the merits of defendant's severance motion, consideration is limited to "the showings then made and the facts then known." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 171 [222 Cal.Rptr. 184, 711 P.2d 480] [severance of counts]; *People* v. *Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669], and *People* v. *Isenor* (1971) 17 Cal.App.3d 324, 334 [94 Cal.Rptr. 746] [severance of defendants].) At the time of the motions to sever, it was known from the preliminary hearing that defendant's thumbprint had been found on the window screen removed to gain entry into Cavallo's residence and on the bullet clip from the gun used to beat Mary at the rape scene; that Mary had identified defendant as the man who beat and raped her; that a .22-caliber gun had been taken from the Cavallo's residence; that .22-caliber cartridges had been taken from a closet and left on a table in his residence; that the bullet clip bearing defendant's thumbprint had similar bullets; and that the clip was similar to one on the missing gun.

■ The initial step in reviewing a trial court's denial of a motion to sever statutorily joinable offenses is to examine the issue of cross-admissibil-

---

[4] Defendant presented expert testimony as to the effect of multiple charges against a single defendant. In discussing the extent to which a second charge of a bizarre rape would affect a murder allegation, the expert opined that such would approximately double the probability of the defendant being perceived as guilty.

ity of evidence: "Since cross-admissibility would ordinarily dispel any possibility of prejudice [citations], we must inquire, had the severance motion been granted, would the evidence pertinent to one case have been admissible in the other under the rules of evidence which limit the use of character evidence or prior similar acts to prove conduct (Evid. Code, § 1101, subds. (a) and (b))." (*Williams* v. *Superior Court, supra,* 36 Cal.3d at p. 448.)

■ Defendant is correct that the rape and murder lacked sufficient distinctive common marks to be cross-admissible to establish the identify of the perpetrator. The rape and murder would be cross-admissible for that purpose only if the manner in which they were committed tended to show the same person committed both crimes. (See *People* v. *Thornton* (1974) 11 Cal.3d 738, 756 [114 Cal.Rptr. 467, 523 P.2d 267]: "[O]nly common marks having some degree of distinctiveness tend to raise an inference of identity . . ."; *People* v. *Haston* (1968) 69 Cal.2d 233, 246 [70 Cal.Rptr. 419, 444 P.2d 91].) The only distinctive feature which the rape and murder share is the bashing of the victim's head. Nothing else about the rape itself suggested that if defendant committed the rape, he also committed the murder.

The prosecution never argued, however, that the two crimes were committed in such an individualized way as to show that defendant must have committed both of them. The trial court was aware that defendant's commission of rape was not alone sufficient to establish his identity as the perpetrator of the murder when it noted that, but for the evidentiary connections, strong argument could be made for severance. We agree that a "common marks" analysis has no application in this case.

The question here, however, is not cross-admissibility of the charged offenses but rather the admissibility of relevant evidence which tended to prove that defendant was the murderer. The evidence found at the rape scene was admissible at the murder trial as circumstantial evidence to show that defendant was the murderer. What was crucial was that the cartridges and gun clip found at the scene of the rape were identified as arguably taken from the scene of the murder. These items were circumstantial evidence that defendant was involved in both crimes. The thumbprint found on the clip, although its legibility for identification was disputed, further tied defendant to the murder. The victim's identification added to the identification of defendant as the perpetrator of the assault and rape and inferentially as the possessor of physical items taken from the murder scene.[5]

---

[5] The identification did not affect the probative value of the evidence found at the rape in terms of its use to show that the person who committed the rape also committed the murder. At the time of the motions to sever, it must be remembered, there was no dispute as to the validity of Mary's identification of defendant.

It was the circumstantial cross-linking of the evidence that prompted the trial court to deny the severance motion, and it was correct in its determination. The court recognized that even if severance were granted, since the gun and fingerprint were additional evidence in support of the prosecution's case that defendant murdered Cavallo, the evidence of that gun and how it was found would have come in in any case. Likewise, if defendant were being tried just for the rape, the evidence of the robbery/murder of Cavallo would have come in as it would help tie defendant to the gun used in the rape and attempted murder of Mary and thus help establish that he was her assailant. In weighing its discretionary power to order separate trials, the trial court could consider this interplay of evidence between the two occurrences. Whether tried separately or together, the interplay would occur. In both situations, the jury's ability to weigh the question of guilt objectively would depend upon effective instructions.

We conclude that the evidentiary connections described above, as the trial court stated, rendered severance an "idle act" and dispelled any possibility of prejudice from the consolidation of the charges. (*Williams, supra,* 36 Cal.3d at p. 448.)[6]

Accordingly, the trial court did not abuse its discretion in denying the motion to sever based upon the showing made at the time of the motion. ■ On appeal following trial, however, there remains the question whether, despite the correctness of the trial court's ruling, a gross unfairness has occurred from the joinder such as to deprive the defendant of a fair trial or due process of law. (See *People* v. *Turner, supra,* 37 Cal.3d 302, 313; *People* v. *Bean* (1988) 46 Cal.3d 919 [251 Cal.Rptr. 467, 760 P.2d 996].) ■ No unfairness or lack of due process appears on this record, which reveals that the jury was convinced of defendant's guilt of the murder long before it was convinced of his guilt as to the rape. The jury commenced deliberations on March 3d. It reached its verdicts of guilt on the murder charges on March 4th. Thereafter the jury requested the rereading of Mary's testimony, the expert testimony regarding the manufacture of the cartridges, and the testimony of the prosecution and defense witnesses regarding the print found on the gun clip left at the scene of the rape. The jury reached its verdicts of guilt as to the rape charges after three additional days of deliberation.

---

[6]Defendant suggests that it may have been possible to "sanitize" the rape victim's identification testimony and that the trial court erred in failing sua sponte to recognize this when it ruled on the severance motion. Defendant cites no authority for imposition of such a duty on the trial court, and we reject the suggestion that the court erred in this regard.

Further, even assuming the question were properly before us and assuming it were possible to "sanitize" the testimony, the procedures would undoubtedly raise due process and Sixth Amendment problems inasmuch as it would limit defense counsel's cross-examination of the identifying witness as to the circumstances of the identification.

One asserting prejudice has the burden of proving it; a bald assertion of prejudice is not sufficient. (*People* v. *Kemp* (1961) 55 Cal.2d 458, 477 [11 Cal.Rptr. 361, 359 P.2d 913].) ▇ Here, as in *Kemp,* defendant asserts that the jury must have been influenced by the evidence of the rape charge in considering the murder charge but does not show how. He points only to the fact of conviction. We conclude, therefore, that defendant suffered no actual prejudice by the joinder of counts of rape and murder.

B. *Motion to Suppress Evidence.*

Defendant moved under section 1538.5 to suppress evidence taken from his residence during a parole search. He contends that the warrantless search, conducted on August 9, 1979, was invalid because (1) he was given no notice of a search condition when last released on parole, and (2) there was no reasonable nexus between the search and the parole process, particularly since he was in custody at the time. These contentions are without merit.

On April 12, 1978, defendant was released on parole for a one-year period. He had been convicted of grand theft auto, assault with intent to commit murder, and escape from state prison with force. The notice and conditions of parole, signed by defendant, included the following search provision: "You and your residence and any property under your control may be searched without a warrant by any agent of the Department of Corrections or any law enforcement officer." Defendant was notified that the search conditions would be in effect for a one-year period.

Nearly eight months later, on December 2, 1978, defendant was arrested for alleged parole violations. Following a parole revocation hearing and findings that defendant had violated his parole by using an illegal substance and possessing a deadly weapon, with which he had committed an assault, defendant's parole was suspended for a six-month period from December 2, 1978, and he was confined in jail to serve another six months in custody. When he was released on June 2, 1979, defendant was required to serve the unexpired four months of his original parole term. Defendant was not given any new or different notice regarding the conditions of his parole—standard procedure of the Santa Rosa parole office and, apparently, the State Department of Corrections when no change is intended in the general or special conditions of parole.

Defendant was again taken into custody on August 2, 1979, following his conviction for assault with a deadly weapon, the offense that had resulted in his prior parole suspension. From the time of his release on June 2 through

August 2, 1979, defendant had reported regularly to his parole officer, Gerald Cardoza.

On August 9, 1979, Detective Gary McMahon of the Santa Rosa Police Department telephoned Cardoza and explained that, in the course of an investigation of a rape at St. Eugene's Church, "he had found a gun print [*sic*] containing Joe Johnson's fingerprints [on the clip]," but no gun. McMahon also indicated that ammunition found at the rape scene was "quite unique" and similar to ammunition found at the home of a recent homicide victim, Cavallo, and that there might be a link between the two crimes.[7]

Cardoza considered this information and asked McMahon "if he would assist me in conducting a parole search in Mr. Johnson's residence for other possible fruits of the crime that show he may have violated his parole." McMahon agreed, and Cardoza went to the police station to accompany McMahon and two other police officers to defendant's residence. On their arrival, Cardoza explained to Mrs. Johnson, who answered the door, that he and the officers "were there to conduct a parole search, and we had reason to believe Joe may have violated his parole." Mrs. Johnson responded that defendant was in jail and she was concerned whether a search was proper. Cardoza assured Mrs. Johnson that the search was proper and encouraged her to call defendant's attorney. The officers then entered the apartment. While they conducted the search, Mrs. Johnson called Ed Krug, defendant's attorney. Cardoza also spoke with Krug and explained the purpose of the search. Krug told Cardoza, "okay, just make sure you let her know if you take anything out of the house." As a result of the search, the officers took a color television from the living room and a man's jacket from the bedroom closet.

The trial court denied a pretrial motion to suppress the evidence obtained from this search (§ 1538.5). The trial court reasoned that the conditions of defendant's parole remained the same following the suspension and that no evidence was presented to indicate that defendant was not aware of the conditions of his parole or that he thought the search condition had been deleted upon his release. The court found that the search was "parole oriented" and therefore proper, instigated by defendant's parole agent to determine whether defendant had again violated his parole.

■ Defendant first argues that he was not given notice of the continued general search condition permitting warrantless searches "by any agent of the Department of Corrections or any law enforcement officer." Defend-

---

[7] Cardoza testified that parole agents routinely review their caseloads to determine if someone they supervise might be a suspect in a new case; a photograph of defendant was one of a number that had been furnished to the police department by the Department of Corrections.

ant's reliance on *Freytes* v. *Superior Court* (1976) 60 Cal.App.3d 958 [132 Cal.Rptr. 26] is misplaced. Freytes was placed on probation with the condition that he pay a fine and consent to warrantless search at any time. Probation was revoked for failure to pay the fine. When later restored to probation, Freytes signed a probation form that listed six conditions, but not consent to warrantless search. Following a subsequent warrantless search and arrest, Freytes unsuccessfully moved to suppress the contraband. The Court of Appeal reversed, holding that the search condition to which Freytes had previously consented no longer existed after probation was revoked and restored. The court concluded that, "[u]nder the doctrine of *expressio unius est exclusio alterius* we must infer that the listing of terms and conditions is complete, and that there are no additional requirements which bind petitioner." (60 Cal.App.3d at p. 962.)

The instant case is distinguishable. There was no second or revised form or notice to support defendant's asserted belief that the conditions of his parole had changed. Significantly, defendant does not argue that his rerelease on parole was intended to fulfill other than the original one-year term.

Defendant's assertion that title 15, section 2356 of the California Administrative Code, now California Code of Regulations, required that he be accorded notice of the conditions of his parole upon rerelease is not supported by a plain reading of that regulation.[8] He proffers no additional authority.

Defendant alternatively argues that the lack of notice of his parole conditions upon rerelease constituted a denial of due process in violation of *Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593], and *In re Prewitt* (1972) 8 Cal.3d 470 [105 Cal.Rptr. 318, 503 P.2d 1326]. In *Morrissey,* the United States Supreme Court held that proceedings for parole revocation must conform to minimum due process requirements. In *Prewitt,* this court held that the procedures required by *Morrissey* are applicable on the question whether an unexecuted order granting parole should be rescinded.

*Morrissey* and *Prewitt* deal with revocation and rescission of parole and the liberty interests implicated thereby, not with release on parole. Defendant's attempted extension of the reasoning of those cases to require renewed

---

[8] Title 15, section 2356 provides: "Prior to release on parole, the prisoner shall be given the notice and conditions of parole by department staff." Section 2355 defines "release on parole" as "the actual transfer of a prisoner confined in prison to parole supervision in the community. Actual release on parole . . . shall occur when all the provisions of these rules and any applicable department regulations have been met."

notice of conditions of parole upon rerelease from custody following a parole suspension is unrealistic and unsupported.

■ Defendant next argues that the search of his residence was invalid because there was no reasonable nexus between the search and the parole process, particularly because it was known at the time of the search that he had been incarcerated for a week. Defendant relies on *People* v. *Coffman* (1969) 2 Cal.App.3d 681 [82 Cal.Rptr. 782].

In *Coffman,* a warrantless search of the defendant's apartment followed a request made to his parole agent by the police. The appellate court held that the search was illegal and the evidentiary products inadmissible. The court reasoned that the search had been "primarily aimed at ordinary law enforcement, not parole administration." (2 Cal.App.3d at p. 689.) The court concluded that "[t]he parole agent was not engaged in administering his supervisorial function. He had not instigated the search nor evinced any official interest in it except in his role as a 'front' for the police. His presence was a ruse, calculated to supply color of legality to a warrantless entry of a private dwelling." (*Ibid.*)

■ *Coffman* stands for the proposition that, absent a proper parole purpose, the parole agent's mere presence or authorization for the search is ineffective to validate the search. On the other hand, as we explained in *People* v. *Burgener* (1986) 41 Cal.3d 505, 536 [224 Cal.Rptr. 112, 714 P.2d 1251], neither police participation in the search nor the parolee's custodial status invalidates an otherwise proper parole supervision purpose. We disapproved *Coffman* insofar as it implied otherwise. (*Id.* at p. 536, fn. 14.)

In *People* v. *Burgener, supra,* 41 Cal.3d 505, we set the standard for parole searches: "The distinction between felony parole and probation justifies the inclusion of the parole search condition in all parole agreements." (*Id.* at p. 532.) ■ Moreover, a parole search is reasonable under the Fourth Amendment if there is a reasonable nexus (a direct and close relationship) between the search and the parole process, and a reasonable suspicion, based on articulable facts, that the parolee has violated the terms of his parole or engaged in criminal activity. "The [parole] agent clearly has a parole supervision purpose in a search undertaken to obtain evidence of a parole violation." (*Id.* at p. 536.)

■ Applying the *Burgener* standard, we find that the trial court did not err in denying defendant's motion to suppress evidence found in his home. The information relayed by Detective McMahon was more than adequate to give rise to a reasonable suspicion that defendant was involved in criminal activity—a rape and possibly a murder—and that evidence

confirming that suspicion would be found at his home. Cardoza's testimony established that upon hearing this information, he asked the police to assist him in conducting a parole search. As the information given also indicated recent parole violations, the search was reasonably, directly and closely related to the purposes of the parole process. Under *Burgener,* neither the fact that police initiated the inquiry which led to the search nor the fact that defendant was in custody on an unrelated charge at the time makes the parole officer's authorization a "ruse," or undermines the validity of the search. (41 Cal.3d at p. 536.) The search was therefore reasonable under the Fourth Amendment.

Since defendant failed to demonstrate lack of notice of his parole search condition and since the search condition was reasonably invoked, the suppression motion was properly denied.

## C. *Denial of a Representative Jury.*

We summarily deal with defendant's only challenge to the composition of the jury. We have consistently held that the exclusion of jurors who would automatically vote against the death penalty does not violate a defendant's constitutional right to trial by an impartial jury or one drawn from a fair cross-section of the community. (*People* v. *Fields* (1983) 35 Cal.3d 329, 374 [197 Cal.Rptr. 803, 673 P.2d 680], cert. den. (1984) 469 U.S. 892 [83 L.Ed.2d 204, 105 S.Ct. 267]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 78-79 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Ainsworth* (1988) 45 Cal.3d 984 [248 Cal.Rptr. 568, 755 P.2d 1017]; see also *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758].) We have found no reason to reexamine our holding. (See *People* v. *Warren* (1988) 45 Cal.3d 471, 479 [247 Cal.Rptr. 172, 754 P.2d 218]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 748 [230 Cal.Rptr. 667, 726 P.2d 113].)

## D. *Defendant as Cocounsel.*

 Defendant contends that he was denied his Sixth Amendment right to self-representation by the trial court's failure to grant his motion to participate at trial as cocounsel. When submitting the motion, defense counsel informed the court that there were a couple of witnesses defendant wanted to cross-examine and so "we're going to ask that he be permitted to act as cocounsel during the course of his trial for purposes of cross-examining a couple of witnesses and if necessary making a remark or two to the jury in the course of some type of argument." There is nothing in the record to indicate that the trial court took any action on defendant's motion, and defense counsel does not assert that he pursued the matter. Accordingly,

defendant is deemed to have waived the point. (*People* v. *Rodgers* (1976) 54 Cal.App.3d 508, 516 [126 Cal.Rptr. 719].)

In any event, neither *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], upon which defendant relies, nor any other authority supports defendant's constitutional claim. (See *People* v. *Miranda, supra,* 44 Cal.3d at pp. 75-76.)

E. *Security Precautions.*

■■■ Defendant contends that the trial court erred in denying his motion for mistrial based on the assertedly extraordinary security precautions to which his wife, the principal defense witness, was subject. These security precautions included searches by female bailiffs outside the presence of the jury before Mrs. Johnson entered the courtroom; being summoned by a bailiff for purposes of conducting such a search; and being escorted by a bailiff to her seat in the courtroom. According to a declaration submitted by Mrs. Johnson, these incidents appear to have been limited to the first day of trial, January 12, 1981, although defense counsel indicated, and the prosecution and trial court appeared to acknowledge, these were routine practices. Also mentioned in Mrs. Johnson's declaration was an incident in which a bailiff approached her and defense counsel and "said 'this defeats the purpose,' and made reference to trusting [defense counsel] but not me during our conversation." This incident and the summoning motion mentioned above were the only incidents which occurred in the general presence of potential jurors.

Based upon the declaration, defense counsel moved for a mistrial on January 26, 1981, well after the trial had commenced. At the hearing on the motion, though acknowledging that the bailiffs never touched Mrs. Johnson in the jury's presence, defense counsel argued that a mistrial was warranted because the security measures over time may have affected or would affect the impartiality of any witnessing jurors.

The trial court denied the motion for mistrial. First noting that the incidents of January 12 had not been previously complained about, the court continued: "On the basis of those two things, the defendant with a documented record of a violent escape from a maximum security penal facility, coupled with at least one occasion of the wife having come to the court house with a knife, I had indicated to our security people without making a big thing of it they should do whatever they thought was appropriate and that I expected it to be done in a genteel and not dramatic way, but I would certainly empower them, though I don't think I had to specifically empower them, in view of the standing concordat with the sheriff of

Sacramento County making him responsible for security, without providing specific okay, they would have been empowered to do exactly what they did. [¶] And I certainly ratify what they did and I don't find a scintilla of showing of prejudice here, so the motion for mistrial is denied."

Defendant argues that the ruling was error under *Parker* v. *Gladden* (1966) 385 U.S. 363 [17 L.Ed.2d 420, 87 S.Ct. 468]. *Parker* is inapposite. In that case, a bailiff stated to each of the jurors in the presence of others that the defendant was guilty, and on another occasion under similar circumstances said to a juror that if there was anything wrong in finding the defendant guilty, the Supreme Court would correct it. The high court reversed the judgment, finding that the unauthorized communications were potentially very prejudicial. The analogy that defendant seeks to draw to the case at bar—that the bailiff's treatment of his wife was tantamount to making statements indicating a belief in defendant's guilt—is much too attenuated to warrant reliance on *Parker* v. *Gladden* as a basis for reversal of judgment.

In sum, defendant asserts no basis upon which to conclude that the trial court's denial of his motion for mistrial was in error.

### F. *Admission of Misdemeanor Conviction.*

Defendant contends that the trial court abused its discretion under Evidence Code section 352 in admitting a misdemeanor conviction of his wife, who appeared as his alibi witness. The conviction was for violation of a Welfare and Institutions Code statute (section unspecified), based on Mrs. Johnson assisting defendant's escape from Patton State Hospital in 1975. Since defense counsel himself elicited the contested evidence on direct examination of Mrs. Johnson, defendant's contention is not persuasive.

In a chambers conference called by the trial judge to ensure that examination of Mrs. Johnson remained within proper bounds, the prosecutor indicated that he intended to question her regarding the fact that she aided and abetted defendant's escape from the mental hospital. The purpose was impeachment: ". . . how can the testimony be trustworthy if she's willing to do anything to assist him?" Defense counsel interposed an objection under section 352 of the Evidence Code.

The trial judge recognized defense counsel's concern not to open the inquiry into the reasons she had involved herself with defendant or how she had done so, but nevertheless ruled that the fact that Mrs. Johnson assisted in the escape was admissible: ". . . it seems like it's clearly impeachment by a bias that [the prosecutor] can get into on the issue of the escape from

Patton . . . clear cut impeachment by bias, which evidence happens to suggest criminal conduct, misdemeanor or felony, doesn't insulate it."

On direct examination, defense counsel elicited from Mrs. Johnson that she had worked as a registered nurse at Patton State Hospital, where she met defendant while he was a patient; that she was having problems with her family at the time; that defendant showed up at her house, and that she went to Michigan with him; that she was arrested in Detroit and subsequently convicted of an offense; and that she later married defendant. On cross-examination, the prosecutor asked Mrs. Johnson only three questions pertaining to this subject area: (1) "Isn't it true that you assisted defendant to escape from the hospital?", to which Mrs. Johnson replied, "That was the charge." (2) "And isn't it a fact that it was your hospital key that assisted the defendant to escape?", to which Mrs. Johnson replied, "No." (3) "Isn't it a fact that he escaped just before he was to be transferred?", to which Mrs. Johnson replied, "Yes."

The record is not entirely clear, and the parties are in disagreement, as to whether the trial court ruled that the conviction itself was admissible. The fact remains that it was defense counsel who brought the conviction to the attention of the jury. Insofar as the court ruled that the prosecutor could cross-examine Mrs. Johnson about her assistance in the escape to show bias and prejudice in favor of defendant and that she had a motive to lie in his behalf at this trial, there was no error. The existence of a bias, interest, or motive to falsify is a commonly used factor to attack the credibility of a witness. (Evid. Code, § 780, subd. (f); *People* v. *James* (1976) 56 Cal.App.3d 876, 886 [128 Cal.Rptr. 733].)

On the facts of this case, we find no reasonable basis to conclude that the trial court abused its discretion in ruling on the evidence to be introduced.

G. *Exclusion of Evidence of Bias.*

 Defendant contends that the trial court erred in denying his requests to impeach prosecution witness James Curry with evidence of specific prior instances of misconduct, including prior criminal convictions, and with evidence that Curry may have bargained with the district attorney to provide favorable testimony in the instant case in exchange for dismissal of unrelated murder charges then pending against him.

James Curry was to be the prosecution witness to show the chain of possession of the television set taken from the home of the murder victim. Prior to trial defendant attempted to discover Curry's criminal record. After several in camera hearings it was determined that Curry had no prior

felony conviction (a suspected burglary conviction involved a different James Curry) and that there was no evidence to support defendant's assertion that the dismissal of the murder charges against Curry was done for purposes of obtaining Curry's cooperation in the case at bar. Accordingly, defendant's argument that evidence of the purported "agreement" should have been presented to the jury for its determination whether the evidence demonstrated a bias, interest or motive to falsify on the part of Curry must fail. (See *People* v. *James, supra,* 56 Cal.App.3d 876, 886.)

### H. *Hypnosis of Rape Victim.*

 Defendant contends that the trial court erred in permitting Mary to testify as to the events surrounding her rape, including identification of her assailant, after she had been hypnotized. Under this court's rulings in *People* v. *Shirley, supra,* 31 Cal.3d 18, and *People* v. *Guerra* (1984) 37 Cal.3d 385 [208 Cal.Rptr. 162, 690 P.2d 635], Mary's testimony was erroneously admitted.

On August 14, 1979, Mary was hypnotized by a police officer to assist her in recalling the appearance of her assailant. During the session, which was attended by the prosecutor, two detectives, and Mary's husband, Mary was asked to picture her assailant, to "note the features . . . take a good notice of his jaw line . . . see his jaw, his cheek-bones . . . ." When asked to describe what she saw, Mary responded, " . . . tall, Black, quite a bit of facial hair . . . I don't see anything deeper than that, I [inaudible] y'know, the outline." The hypnotist instructed Mary to "look deep at him, look deep, look through that facial hair, try to see the structure of his face . . . ."

The next day, August 15th, Mary attended a lineup in which she identified defendant, who was clean shaven, as her assailant, and she subsequently identified defendant as her assailant at the preliminary hearing and at trial a year later. When asked at trial if her recollection of her assailant's appearance was influenced by her identification of defendant in the lineup, Mary responded, "I can recall him as I saw him in the church, yes."

 In *People* v. *Shirley, supra,* 31 Cal.3d at pages 66-67, this court held that "the testimony of a witness who had undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events, from the time of the hypnotic session forward." This exclusionary rule was given retroactive effect to "all cases not yet final as of the date it was decided." (*People* v. *Guerra, supra,* 37 Cal.3d at p. 390.)

The Attorney General concedes that the *Shirley-Guerra* rule applies to this case, but argues that reversal is not mandated because the error in admitting Mary's testimony and identification of defendant was harmless. In *Shirley,* this court held that "error in admitting the testimony of a previously hypnotized witness is not reversible per se; its effect must still be judged under the prejudicial error test adopted in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]." (31 Cal.3d at p. 68.) Under this test, the appellate court must determine whether "it is reasonably probable that a result more favorable to the defendant would have occurred if the testimony of the previously hypnotized witness as to all matters relating to the events of the crime had not been admitted." (*Id.* at p. 70.)

The Attorney General argues that Mary's testimony was not essential to the prosecution's case because "[t]he vicious rape and beating [Mary] suffered was more than adequately covered by the testimony of Father Keegan, Betty Jane Kropp, Dr. Kenneth Howe, and Dr. David Sheet." In addition to this testimony, respondent points to evidence that the gun parts and ammunition found at the rape scene were consistent with those from the murder scene and that defendant's thumbprint was found at both scenes.

While persuasive, the testimony of the other four prosecution witnesses was by no means as incriminating as that of Mary. Father Keegan did not testify about the appearance of the assailant; Ms. Kropp, who saw Mary's assailant, did not identify defendant; Dr. Howe merely testified in pertinent part that Mary had told him she had been raped by a tall Black man with a beard and a gun; and Dr. Sheet testified in pertinent part only that the weapon depicted in the prosecution photographs of Field King and Sport King models of a High Standard semi-automatic .22-caliber handgun could have caused Mary's head injuries.

Mary's testimony provided the only direct evidence linking defendant with the rape. In addition to her identification, there was the circumstantial evidence of defendant's fingerprint on the gun clip. In contrast with the thumbprint at the murder scene, however, the thumbprint evidence at the rape scene was the subject of controversy between prosecution and defense experts as to its legibility.

The presence of the Monark .22-caliber cartridges and the possibility that defendant owned a handgun similar to that used in the rape was also circumstantial evidence that defendant was involved in that crime. Nevertheless, Mary's testimony provided the strongest evidence linking defendant with the rape, and it is probable that the jury placed particular emphasis on her positive identification of defendant in reaching its verdict as to the rape.

Mary testified that she identified defendant based on her memory of him at the time of the assault rather than at the lineup; this testimony may have been particularly convincing to the jury. As this court noted in *People v. Shirley, supra,* a witness who is uncertain in his recollections will, after hypnosis, become positive in his recollections: "[T]he effect not only persists, but the witness' conviction of the absolute truth of his hypnotically induced recollection grows stronger each time he is asked to repeat the story; by the time of trial, the resulting 'memory' may be so fixed in his mind that traditional legal techniques such as cross-examination may be largely ineffective to expose its unreliability." (31 Cal.3d at pp. 65-66.)

Accordingly, we conclude that Mary's testimony concerning all matters relating to the identity of her assailant was improperly admitted at trial. Since the identification testimony undoubtedly helped secure defendant's conviction on the rape charges, we are compelled to reverse the convictions of the rape and related charges.

We reject defendant's contention that the *Shirley* error was prejudicial to the murder verdict. We are persuaded that the verdicts on the murder and related counts can and did stand alone and should be affirmed.

There was strong circumstantial evidence connecting defendant to the murder. The thumbprint on the screen tied defendant to the scene of the murder. ▬▬ We stated in another capital case, *People v. Gardner* (1969) 71 Cal.2d 843, 849 [79 Cal.Rptr. 743, 457 P.2d 575]: "Fingerprint evidence is the strongest evidence of identity, and *is ordinarily sufficient alone to identify the defendant.*" (Italics added.) ▬▬ In this case, the jury had more—one of the items taken, the television set, was found in the residence of defendant. Other evidence established how the television had come to the home of defendant. James Curry, defendant's coworker, testified that defendant asked him to "hold" the television set and that a few weeks later he was instructed to deliver it to defendant's wife. A janitorial supervisor at Curry's workplace observed the exchange of the television set from defendant's trunk to Curry's trunk.

The jury were also aware of the evidentiary cross-linking between the murder and the rape scenes and, even without the victim's testimony, would have learned that defendant was involved in a charge of rape.

The jury was instructed that each count charged a distinct offense and that it must consider and decide each count separately. Earlier, at the time of jury selection the jurors had been extensively voir dired as to their ability to separate the evidence. Finally, as noted above in our discussion of the

severance issue, the jury apparently had no difficulty reaching a verdict on the murder count.

We have no hesitation in concluding that it is not reasonably probable that the jury would have reached a different verdict on the murder count had it not heard the testimony of the rape victim.

I. *Special Circumstance Allegations.*

Defendant raises two issues as to the validity of the special circumstance findings—that the trial court erred in failing to instruct on the requirement of an intent to kill under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], and that it was error to allege special circumstances as to both the burglary and robbery connected with the murder. Each contention has been rejected in prior decisions of this court.

In *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] we overruled *Carlos* and held that an instruction that the jury must find intent to kill in connection with a felony-murder special circumstance is not required when the defendant is the actual killer. (*Id.* at pp. 1147-1148; see also *People* v. *Gates* (1987) 43 Cal.3d 1168, 1193 [240 Cal.Rptr. 666, 743 P.2d 301].) In this case, there is no issue of accomplice liability; the jury necessarily found that defendant was the actual killer. Hence, no instruction on intent to kill was required. Further, since the record establishes beyond a reasonable doubt that defendant was the actual killer in this case, the finding required by *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368], is satisfied. (*Cabana* v. *Bullock* (1986) 474 U.S. 376 [88 L.Ed.2d 704, 106 S.Ct. 689].)

There is no error in charging both robbery and burglary as special circumstances despite the fact that the felonies occurred during a single course of conduct undertaken to further one criminal objective. (*People* v. *Harris* (1984) 36 Cal.3d 36, 60-61 [201 Cal.Rptr. 782, 679 P.2d 433].) *Harris* upheld the procedure to allow the prosecutor to charge any special circumstance supported by the evidence.

### III. PENALTY PHASE ISSUES

Defendant persuasively contends that the court committed reversible error under *People* v. *Ramos, supra,* 37 Cal.3d 136. In accordance with the so-called Briggs Instruction, the court delivered the following unqualified charge: "You are instructed that under the state Constitution, a governor is empowered to grant a reprieve, pardon or commutation after sentence following conviction of a crime. Under this power a governor may in

the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole." (CALJIC No. 8.84.2 (1979).)

In *People* v. *Ramos, supra,* 37 Cal.3d at page 153, we held that "the Briggs Instruction is incompatible with [the] guarantee of 'fundamental fairness' [established in the due process clauses of our Constitution (Cal. Const., art. I, §§ 7, 15)] both because it is seriously and prejudicially misleading and because it invites the jury to be influenced by speculative and improper considerations."

*Ramos* error is generally reversible. (*People* v. *Ramos, supra,* 37 Cal.3d at p. 154; *People* v. *Montiel* (1985) 39 Cal.3d 910, 928 [218 Cal.Rptr. 572, 705 P.2d 1248].) Thus, when the court has instructed the jury with the unadorned Briggs Instruction and fails to ameliorate the potential for prejudice, we have reversed the penalty judgment. (*People* v. *Ramos* (1982) 30 Cal.3d 553 [180 Cal.Rptr. 266, 639 P.2d 908]; *People* v. *Anderson, supra,* 43 Cal.3d 1104, 1151; *People* v. *Warren, supra,* 45 Cal.3d 471, 489; *People* v. *Myers* (1987) 43 Cal.3d 250, 270-273 [233 Cal.Rptr. 264, 729 P.2d 698]; *People* v. *Montiel, supra,* 39 Cal.3d 910, 928; *People* v. *Ramos, supra,* 37 Cal.3d at p. 154; *People* v. *Haskett* (1982) 30 Cal.3d 841, 861-863 [180 Cal.Rptr. 640, 640 P.2d 776]; *People* v. *Bunyard* (1988) 45 Cal.3d 1189 [249 Cal.Rptr. 71, 756 P.2d 795]. Cf. *People* v. *Hamilton* (1988) 45 Cal.3d 351, 375-376 [247 Cal.Rptr. 31, 753 P.2d 1109]; *People* v. *Coleman* (1988) 46 Cal.3d 749 [251 Cal.Rptr. 83, 759 P.2d 1260]; *People* v. *Griffin* (1988) 46 Cal.3d 1011 [251 Cal.Rptr. 643, 761 P.2d 103].)

The Attorney General argues that reversal is not compelled in this case because the defense introduced evidence at the penalty phase that commutation by the Governor is an unlikely possibility. The defense called Raymond Procunier, Director of Corrections from 1967 until 1975, who testified that he did not recall any acts of executive clemency or parole consideration in that period for persons held for life without possibility of parole and that, in his experience, life without possibility of parole meant life in prison without parole. Defense counsel argued in this vein to the jury.

We are not persuaded that the testimony of the defense expert or counsel's argument ameliorates the potential for prejudice contained in the court's instruction which we have decided is "seriously and prejudicially misleading." The expert's experience notwithstanding, the instruction permits the jury to speculate regarding future executive action. We therefore conclude that the error in instructing the jury with the Briggs Instruction requires us to reverse the penalty judgment.

## IV. CONCLUSION

The judgment of guilt as to the rape and related counts is reversed. The judgment of guilt as to the murder and related counts and the findings of special circumstances are affirmed. The judgment of death is reversed.

Lucas, C. J., Mosk, J., Broussard, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

Appellant's petition for a rehearing was denied February 16, 1989.