[No. D046986. Fourth Dist., Div. One. June 27, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN KEVIN HUNTER, Defendant and Appellant.

COUNSEL

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry Carlton and Stephanie H. Chow, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

IRION, J.—A jury convicted John Kevin Hunter of residential burglary (Pen. Code, §§ 459, 460), vehicle theft (Veh. Code, § 10851, subd. (a)), and receiving and concealing a stolen vehicle (Pen. Code, § 496d). Hunter admitted prior convictions and was sentenced to two concurrent indeterminate prison terms of 25 years to life, with a consecutive five-year determinate term for a serious prior felony enhancement (Pen. Code, §§ 667, subd. (a), 668, 1192.7, subd. (c)).

Hunter argues that the trial court erred in denying a motion to suppress evidence seized in a warrantless search of his storage unit while he was

incarcerated for parole violations, but before his parole was formally revoked. Hunter also argues that inculpatory statements he made to a police detective after learning that items had been seized from the storage unit should have been suppressed as the product of the warrantless search. As we will explain, we conclude that the warrantless search of the storage unit was permissible under the Fourth Amendment as a parole search because Hunter's parole had not been formally revoked at the time the search occurred. Accordingly we reject Hunter's arguments and affirm the judgment.

I

## FACTUAL AND PROCEDURAL BACKGROUND

Rita Berglund's house was burglarized on June 14, 2003. Approximately $8,000 worth of personal property was taken from inside the house, including jewelry. A Lexus automobile was taken from the garage. Approximately one month later, a deputy sheriff spotted the stolen Lexus in a casino parking lot and stopped the driver. The driver fled on foot and escaped. Items of jewelry stolen from Berglund's home were found inside the Lexus, along with paperwork belonging to Hunter, including a receipt for a U-Haul storage unit rented by Hunter and the name and telephone number of Hunter's parole agent, Ricardo Carlos.

Detective Jose Baltz, who was investigating the burglary, contacted Carlos. Detective Baltz found out from Carlos that Hunter had been arrested on unrelated parole violations and placed into custody on August 1, 2003.

On August 13, 2003, Carlos, Detective Baltz and another police officer performed a warrantless search of Hunter's storage unit. Inside the storage unit they found items taken from Berglund's house during the burglary.

After searching the storage unit, Detective Baltz interviewed Hunter in prison. During the interview, Detective Baltz told Hunter that he had searched his storage unit and found property taken in the Berglund burglary. Hunter admitted to being at the scene of the burglary, but stated that he remained outside the house while someone else committed the break-in.

Arguing that the search of the storage locker was illegal because it was performed without a warrant, Hunter moved to suppress the items seized in the search of the storage locker and all statements obtained from him during the interview with Detective Baltz. In the trial court, Hunter argued he "was not subject to a parole search because his parole had been revoked and he was in custody at the time of the search." (Underscoring omitted.)

The prosecutor opposed the motion, explaining that the search was permitted because Hunter was subject to the conditions of his parole at the time the search was performed. The prosecutor pointed out that even though Hunter was incarcerated at the time of the search, *his parole was not revoked until more than a month later* when the Board of Prison Terms conducted a parole revocation hearing.

At a suppression hearing, Carlos testified about Hunter's parole status, referring to documents from the Department of Corrections. Carlos explained that because he was not able to locate Hunter in the community, a warrant for Hunter's arrest was issued as of July 9, 2003, making Hunter a "parolee at large."[1] After locating Hunter, Carlos took him into custody on August 1, 2003, for the parole violations of using methamphetamine and absconding from parole supervision. On August 1, 2003, Hunter was placed back in custody pursuant to a parole hold. It was during the parole hold period that the storage unit was searched. Hunter's parole was not formally revoked until September 17, 2003, after a hearing held by the Board of Prison Terms. (See Cal. Code Regs., tit. 15, § 2645 [regulation providing for parole revocation hearing by Board of Prison Terms].) Carlos testified that until there is a formal revocation, an inmate is still subject to the conditions of parole.

The trial court denied Hunter's motion to suppress. It explained, "The evidence in this case was that the defendant had been taken into custody on an alleged parole violation but had not yet had a hearing . . . at the time the events that are the subject of this motion to suppress took place. Therefore, within the meaning of the case law, my conclusion is that the Fourth Amendment condition imposed by state law on all parolees was still in effect, and the motion is, therefore, denied."

At trial, witnesses testified about the items found in Hunter's storage unit, and an audio recording of Hunter's interview with Detective Baltz was played for the jury, accompanied by a transcript. The jury convicted Hunter of residential burglary (Pen. Code, §§ 459, 460), vehicle theft (Veh. Code, § 10851, subd. (a)), and receiving and concealing a stolen vehicle (Pen. Code, § 496d).

---

[1] Pursuant to Penal Code section 3060, "[t]he written order of the parole authority shall be a sufficient warrant for any peace or prison officer to return to actual custody any . . . paroled prisoner."

## II

## DISCUSSION

### A

*The Trial Court Did Not Err in Denying Hunter's Motion to
Suppress the Items Seized from His Storage Unit*

Hunter first argues that the items seized from the storage unit should have been suppressed because the search was unreasonable under the Fourth Amendment. Hunter argues that his "parole agent had no legal authority to conduct a warrantless search" "once [his] parole was violated and he was physically returned to prison as a result of that violation." Hunter's fundamental argument is that a parolee who is returned to prison and awaiting a parole revocation hearing is no longer subject to parole searches.

■ As recently established by the United States Supreme Court, reasonable suspicion is not required for a parole search, with the limitation that the search may not be arbitrary, capricious or harassing. (*Samson v. California* (2006) 547 U.S. ___ [165 L.Ed.2d 250, 126 S.Ct. 2193].) A suspicionless parole search is constitutionally permissible because the parolee lacks a legitimate expectation of privacy and the state has a substantial interest in supervising parolees and reducing recidivism. (*Samson v. California, supra,* 547 U.S. ___ [165 L.Ed.2d 250].)

Hunter does not dispute that the search of the storage locker would have been permissible as a warrantless parole search under the Fourth Amendment *if* he had not been imprisoned on a parole violation at the time of the search. Instead, Hunter's argument focuses narrowly on the "question of whether a parole agent *maintains authority* to conduct a warrantless search . . . some two weeks after the parolee has been returned to state prison for a parole violation, unrelated to the crime for which he subsequently becomes a suspect and which precipitated the search." (Italics added.) He seeks to "establish the temporal parameters of a parole officer's authority to conduct [warrantless] searches."

■ As we will explain, we conclude that Hunter's parole officer retained the authority to conduct an otherwise permissible parole search while Hunter was incarcerated on a parole violation *because Hunter was still a parolee until his parole was formally revoked.* Central to our conclusion is the fact that the parole search was conducted on August 13, 2003, but Hunter's parole was not formally revoked until more than a month later on September 17, 2003.

In concluding that Hunter's incarceration did not invalidate the parole search, we first rely on two decisions of our Supreme Court that approved parole searches conducted while the defendant was in physical custody. *People v. Burgener* (1986) 41 Cal.3d 505, 529–536 [224 Cal.Rptr. 112, 714 P.2d 1251], approved a search by a parole officer conducted at the request of police *after the defendant was arrested* for a new crime. The court explained that it was not "relevant that the parolee may already be under arrest when the search is conducted." (*Id.* at p. 536.) Similarly, *People v. Johnson* (1988) 47 Cal.3d 576, 591–596 [253 Cal.Rptr. 710, 764 P.2d 1087], approved a postarrest parole search conducted at the home of the defendant, who, at the time of the search, had been incarcerated for seven days for a different crime. The defendant argued that the search of his residence was invalid because "it was known at the time of the search that he had been incarcerated for a week." (*Id.* at p. 594.) Following *Burgener*, *Johnson* rejected the defendant's argument and ruled that the parole search was valid despite the defendant's incarceration. (*Johnson*, at p. 595.)[2]

 Hunter argues that *Burgener* and *Johnson* do not apply because the defendants in those cases were not incarcerated *for parole violations*. Hunter contends that incarceration for a parole violation serves to revoke the conditions of parole, including the condition that the parolee submit to a warrantless search. We disagree because, as we will explain, parole is not revoked until a formal revocation hearing is held.

We base our analysis on the long-standing principle that due process must be afforded before parole is revoked. (*Morrissey v. Brewer* (1972) 408 U.S. 471, 487–488 [33 L.Ed.2d 484, 92 S.Ct. 2593].)[3] This due process require-ment means that even though a parolee may be arrested on a parole violation, his parole may not be formally revoked until he has been afforded a formal parole revocation hearing. As the system is implemented in California, a parole agent may arrest a parolee for a suspected parole violation and place the parolee on a "parole hold" when, according to the applicable regulations, he is a danger to himself or others or he may abscond. (Cal. Code Regs.,

---

[2] Both *People v. Burgener*, *supra*, 41 Cal.3d 505, and *People v. Johnson*, *supra*, 47 Cal.3d 576, were decided under the rule requiring reasonable suspicion for a parole search. That rule was abrogated by *People v. Reyes* (1998) 19 Cal.4th 743, 752–754 [80 Cal.Rptr.2d 734, 968 P.2d 445], and *Samson v. California*, *supra*, 547 U.S. ___ [165 L.Ed.2d 250].) We rely on *Burgener* and *Johnson* for their holding that the search of an incarcerated defendant may be evaluated as a parole search. Because *Burgener* and *Johnson* have been overruled by *Reyes* and *Samson*, we do not rely on them for their reasonable suspicion analysis.

[3] Indeed, California officials have been involved in recent litigation concerning whether the due process they afford to parolees on parole hold status is consistent with constitutional requirements. (See *Valdivia v. Davis* (E.D.Cal. 2002) 206 F.Supp.2d 1068 [holding that California's unitary parole revocation system violated the due process rights of the plaintiff class by unduly delaying preliminary hearings prior to the formal parole revocation hearings].)

tit. 15, §§ 2600, 2601; *Swift v. Department of Corrections* (2004) 116 Cal.App.4th 1365, 1371 [11 Cal.Rptr.3d 406] ["parole agents are authorized to issue parole holds for the purpose of detaining a parolee prior to a parole revocation hearing"]; *In re Law* (1973) 10 Cal.3d 21, 24, fn. 2 [109 Cal.Rptr. 573, 513 P.2d 621] [describing that a parole hold occurs when "a parole agent . . . causes a parolee to be restrained in custody independent of any action by the decision-making component of the [predecessor to the Board of Prison Terms]"].) Unless the parole hold is earlier removed, it will be maintained until the parolee receives a formal parole revocation hearing by the Board of Prison Terms, which, by regulation, should be held within 45 days of the date the parole hold is placed. (Cal. Code Regs., tit. 15, § 2640, subd. (e).) "At the revocation hearing the hearing panel shall decide whether there is good cause to believe a condition of parole has been violated and, if so, the most appropriate disposition . . . ." (Cal. Code Regs., tit. 15, § 2645, subd. (a).) The disposition may include revocation of parole or a release back into the community. (*Id.,* § 2646.) Under this system, Hunter was a parolee subject to a parole hold while he was incarcerated and awaiting a hearing by the Board of Prison Terms to determine whether his parole would be revoked.

■ Although we have not located or been directed by the parties to any case law expressly stating that an officer's authority to conduct a parole search survives until a revocation hearing is held,*People v. Barkins* (1978) 81 Cal.App.3d 30 [145 Cal.Rptr. 926] addresses the issue in the similar context of a probation search. *Barkins* is helpful to our analysis because parole and probation are similar insofar as due process must be afforded before either is revoked. (*Gagnon v. Scarpelli* (1973) 411 U.S. 778, 782 [36 L.Ed.2d 656, 93 S.Ct. 1756] [due process required prior to probation revocation, like parole revocation].) Resting its analysis on the fact that due process must be afforded before revocation of probation, *Barkins* ruled that authorities could legally conduct a probation search up until the time that probation was formally revoked, regardless of the probationer's custodial status. In *Barkins*, "[s]ome 21 months prior to the search, [the defendant's] probation had been summarily revoked and a bench warrant had been issued for his arrest," but no formal probation revocation hearing had been held. (*Barkins*, at p. 32.) The defendant argued that his probation terminated when the bench warrant was issued, and thus a probation search made during that period was unlawful. (*Ibid.*) *Barkins* concluded that "[a]*ctual revocation of probation cannot occur until the probationer has been afforded . . . due process hearing rights . . . .* Thus, until [due process] has been satisfied, the terms of probation remain in effect." (*Id.* at p. 33, italics added, citation omitted.) Because probation had not been revoked, "the [search] condition of probation authorized the search." (*Ibid.*) The same reasoning applies here. As we have explained, due process is required to revoke parole, and thus, as *Barkins* held with respect to probation, until due process is afforded, the terms and

conditions of parole remain in force. Applying *Barkins*'s reasoning, a parole search is authorized until parole is formally revoked.[4]

Our conclusion that authorities may conduct a parole search until parole is formally revoked also rests on the fact that a parole search conducted after a parolee is incarcerated for a parole violation may provide information that is directly relevant to the parole supervision process. As *Samson* recognized, a suspicionless parole search is permissible because of the state's " 'over-whelming interest' in supervising parolees." *Samson v. California, supra,* 547 U.S. ___ [165 L.Ed.2d 250].) Consistent with this interest, the applicable regulations provide that after placing a parolee on a parole hold for a suspected parole violation, "[a] parole agent shall investigate all cases of a parolee suspected of a parole violation. . . ." (Cal. Code Regs., tit. 15, § 2617.) To inform the Board of Prison Terms' decision whether to revoke parole, the parole agent prepares a parole violation report, which "is a document prepared by the parole agent specifying the parole violation charges against a parolee, and containing or referring to the information known to the parole agent relevant to the charges." (Cal. Code Regs., tit. 15, §§ 2618, 2636.) A parole search conducted during a parole hold directly facilitates the collection of information in preparation for the Board of Prison Terms' parole revocation hearing, and thus, like other parole searches, is justified by the state's interest in supervising parolees.

As one federal court has recognized, a "parole officer's interest in inspecting [the parolee's] place of residence [does] not terminate upon his arrest; if anything, it intensifie[s]. Revocation is not a necessary consequence of a parole violation . . . . In making their decision regarding disposition, the parole authorities need to know the number and seriousness of all violations, as well as other current information about the parolee's progress." (*Latta v. Fitzharris* (9th Cir. 1975) 521 F.2d 246, 252.) We agree with the Attorney General's position that "once [Hunter] was awaiting parole revocation proceedings, the parole authorities had a significant interest in determining the extent and nature of all his violations in order to make a valid decision on whether to revoke his parole." We conclude that when there has not yet been a formal decision on parole revocation, a parole agent's ability to obtain information through a parole search furthers the goals of parolee supervision, and such a search should be governed by the same Fourth Amendment rules that apply to all searches performed on parolees.

---

[4] Hunter also contends that he should not have been subject to the parole search condition because "nothing in the notice of parole conditions indicated that the warrantless search conditions could be invoked *even after* [*Hunter*] *was no longer a parolee but a state prison inmate.*" The flaw in this argument is that until Hunter's parole was formally revoked, he was *still* a parolee albeit on a parole hold and housed in prison. The terms and conditions of parole put Hunter on notice that "*parole* is subject to the following notice and conditions." (Italics added.) Here, Hunter was still formally *on parole.*

B

*Hunter's Statements to the Police Were Not the Product of an Illegal Search*

Based on his claim that the search of the storage unit was illegal, Hunter argues that the statements he made to Detective Baltz after learning that Berglund's property was found in the storage unit should also be suppressed as the fruits of an illegal search. (See *Wong Sun v. United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 83 S.Ct. 407].) Because we have concluded that the search of the storage unit was a permissible parole search, we reject Hunter's argument.

DISPOSITION

The judgment is affirmed.

McConnell, P. J., and Benke, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 11, 2006, S145412.