[Crim. No. 5188. Third Dist. Dec. 16, 1969.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM HARRY COFFMAN, Defendant and Appellant.

**COUNSEL**

John D. Barr, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Willard F. Jones, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FRIEDMAN, Acting P. J.**—Defendant was convicted by a jury of three separate counts of second degree burglary. The first involved burglary of the 99 Club, a bar in Chico, in the early morning hours of June 9, 1968. The other two counts arose from burglaries of the Lee dwelling and the Shrader dwelling. He appeals from the judgment.

Initially, defendant charges lack of substantial evidence that he burglarized the 99 Club. On opening the bar the morning of June 9, the owner found that it had been burglarized. The following items were missing: 10 to 12 cellophane-wrapped sandwiches: 4 to 6 six-packs of Olympia beer; 1 unopened box of cigars, and 3 partially filled boxes of cigars; coins from a coin-operated shuffleboard game and from a cigarette machine.

Two witnesses had been parked in an automobile near the 99 Club in the early morning hours of June 9. They saw a man walk away from the bar carrying a carton of the kind in which beer is delivered. He placed the carton in a light-colored station wagon parked nearby, then returned to the bar and came back with a second carton with smaller packages in it. Both witnesses described the man as about 40 years of age, rather bald and heavyset, and wearing white gloves. One of the witnesses identified defendant as the man; the other testified that defendant resembled the man. Both testified that the station wagon had a temporary paper license on the right rear window. One identified the station wagon as a Ford.

Some time after the burglary of the 99 Club, Officer Earl Summers examined a police investigation report containing information supplied by the two eyewitnesses. Thus he was familiar with the suspect's description and the appearance of the station wagon. On July 29 at approximately 11 p.m. Summers was on routine patrol and saw a light-colored 1962 Ford station wagon parked across the street from an apartment house situated behind the 99 Club. No other cars were parked in the vicinity. Defendant was seated behind the wheel of the station wagon. As Summers drove by, defendant turned his head away, preventing Summers from seeing his face. Summers turned around and drove toward the vehicle with his headlights on high beam. Defendant tipped his head, again preventing Summers from seeing his face. Summers stopped, went up to the station wagon and asked defendant what he was doing in the area. Defendant explained that he was waiting for his girl friend, Beverly Nutter, who lived in the apartment house across the street. When backup officers arrived, Summers went to the apartment house and found no person of that name living there. When Summers informed defendant of this fact, defendant told Summers that the woman's name was Betty instead of Beverly. At this point Summers realized

that defendant and his car answered the descriptions of the person and vehicle involved in the burglary of the 99 Club. He also observed scotch-tape marks, typical of marks left when a temporary license is removed, on the right rear window. They drove to the station, defendant following Summers in his car. Summers pulled out the 99 Club burglary report to verify the descriptions. He then arrested·defendant.

After the station wagon had been parked in the police station parking lot, an ammunition cartridge was seen in plain view on the floor of the rear compartment. Defendant then consented to a search of the car. As a result of the search the officers found a temporary paper license and soiled white gloves in the glove compartment, a fully loaded .32 caliber pistol, six rounds of ammunition, a box containing four cigars and a white cloth with two eyeholes cut out.

A search of defendant's apartment revealed a filled box and two partial boxes of cigars, also an empty Olympia beer case. The search of the apartment and a search of defendant's mother's house (the latter, with the mother's consent) uncovered property taken in the Lee and Shrader burglaries. The pistol found in his station wagon had been stolen from the Shrader home.

█ Defendant's claim of inadequate evidence of the 99 Club burglary is bottomed on the "fungible" character of the cigars and beer case found in his car and apartment. He argues that such articles may be purchased anywhere and supports his argument by his own testimony that he smokes cigars. █ Possession of goods taken from the burglarized premises is a material fact. (*People* v. *Citrino*, 46 Cal.2d 284, 288 [294 P.2d 32].) The law does not demand positive identification of the goods as a prerequisite to jury consideration. The prosecution may prove the defendant's possession of items resembling and which may actually be the stolen ones; such evidence supplies a substantial basis for a finding of possession. (*People* v. *Hickok*, 198 Cal.App.2d 442, 444-445 [17 Cal.Rptr. 875]; *People* v. *Harsch*, 44 Cal.App.2d 572, 576 [112 P.2d 654]; 12 C.J.S. 724.) █ The brands and shapes of the four varieties of cigar found in defendant's automobile and apartment corresponded precisely with those missing from the 99 Club: a full box of Dutch Masters Panatellas, one part box of Dutch Masters Presidents and two part boxes of Roi-Tan Panatellas. Defendant's possession of articles corresponding to the stolen property and the eyewitness testimony of his activities outside the 99 Club at the approximate time of its burglary form substantial evidence of guilt.

█ Defendant contends that his arrest was illegal, hence that any evidence produced thereafter was inadmissible. Apparently this contention

is aimed particularly at the items found in his car immediately after his arrest. The objection is unavailable on appeal, for defendant's trial counsel did not object when these items were offered in evidence. The objection would have been unavailing in any event. Officer Summers had adequate reason to question defendant as the latter sat in his parked car. (*People* v. *Mickelson,* 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658].) Thereafter a cumulative series of suspicion-evoking circumstances and insights occurred, so that by the time of the arrest the officer had reasonable cause to believe that defendant was the person who had burglarized the 99 Club. (See *People* v. *Koelzer,* 222 Cal.App.2d 20, 24-28 [34 Cal.Rptr. 718].) The warrantless arrest was therefore lawful. (Pen. Code, § 860, subd. 3.) Defendant's consent, which preceded the search of his station wagon, was valid because it was not connected with an illegal arrest. Made after a valid consent, the search was lawful. (See *People* v. *Johnson,* 68 Cal.2d 629, 632 [68 Cal.Rptr. 441, 440 P.2d 921]; Witkin, Cal. Evidence (2d ed. 1966) §§ 77, 79.)

 Lastly, defendant charges inadequate representation by his court-appointed trial counsel (who does not represent him on appeal). The claim is premised on the attorney's failure to raise the objection of an illegal search when the prosecution offered stolen articles uncovered in a warrantless search of defendant's apartment. The following articles were found in the search of defendant's apartment: (1) a full box of Dutch Masters cigars and two of the partially filled boxes, as well as an Olympia beer case, all apparently stolen from the 99 Club; (2) a portable television set, rifle, shotgun, clock-radio and travel alarm, all later identified as stolen from the Lee dwelling.

 Defendant was a parolee at the time of the events. The day after his arrest a Chico police officer investigating the burglaries phoned John Ransom, a parole agent at the Redding office of the Department of Corrections. He asked Ransom to accompany the police in a search of defendant's apartment in Corning. Ransom agreed and instructed the officer to obtain defendant's apartment key from his personal belongings at the jail. Three police officers met Ransom at the apartment. Ransom then conducted a search with the three officers following him as he moved through the apartment. This procedure, he testified, was "standard in [his] department." At the time of the search he knew that defendant was under arrest for burglary.[1]

---

[1]When the prosecutor called a police witness to testify to the search of the apartment, defendant's attorney raised the objection of illegal search. The prosecutor then called Ransom, the parole agent, to testify before the jury. Defense counsel then objected that disclosure of Ransom's official status implicitly revealed defendant's

*People* v. *Denne,* 141 Cal.App.2d 499, 507-510 [297 P.2d 451], held that prevailing Fourth Amendment standards of "reasonable search" do not apply to searches of a parolee by parole officers. The *Denne* case was followed by this court in *People* v. *Hernandez,* 229 Cal.App.2d 143, 150 [40 Cal.Rptr. 100] (cert. den. 381 U.S. 953 [14 L.Ed.2d 725, 85 S.Ct. 1810]), which stated the following rule: "For the purpose of maintaining the restraints and social safeguards accompanying the parolee's status, the authorities may subject him, his home and his effects to such constant or occasional inspection and search as may seem advisable to them. Neither the Fourth Amendment nor the parallel guaranty in article I, section 19, of the California Constitution blocks that scrutiny. He may not assert these guaranties against the correctional authorities who supervise him on parole."

The Attorney General cites five later appellate decisions involving a search of the parolee's dwelling, all of which adopted the *Denne-Hernandez* rationale. (*People* v. *Limon,* 255 Cal.App.2d 519, 521-522 [63 Cal.Rptr. 91]; *People* v. *Thompson,* 252 Cal.App.2d 76, 85 [60 Cal.Rptr. 203]; *People* v. *Quilon,* 245 Cal.App.2d 624, 627 [54 Cal.Rptr. 294]; *People* v. *Gastelum,* 237 Cal.App.2d 205, 207-208 [46 Cal.Rptr. 743]; *People* v. *Giles,* 233 Cal.App.2d 643, 647 [43 Cal.Rptr. 758].) He cites these to support the contention that the parole officer's physical presence or his delegation of authority to the police validates the search without regard to its instigating source.

█ The contention is inacceptable. A parolee is not stripped of constitutional protection. (See *In re Jones,* 57 Cal.2d 860, 862 [22 Cal.Rptr. 478, 372 P.2d 310]; cf. *People* v. *Goss,* 193 Cal.App.2d 720, 725 [14 Cal.Rptr. 569].) Parolee status alone does not justify a search by peace officers other than parole agents. (*People* v. *Thompson, supra,* 252 Cal.App.2d at p. 85; see also *People* v. *Gallegos,* 62 Cal.2d 176, 178 [41 Cal.Rptr. 590, 397 P.2d 174].) █ When a parole agent is justified in making a search, he may enlist the aid of the police. (*People* v. *Thompson, supra.*) The parole agent's physical presence, even his nominal conduct of the physical acts of search, does not signalize validity. The purpose of the search, not the physical presence of a parole agent, is the vital element. In *Hernandez, supra,* we explicitly conditioned the search's validity upon a "purpose of maintaining the restraints and social safeguards accompanying the parolee's status . . . ." (229 Cal.App.2d at p. 150.)

█ The warrantless search of defendant's apartment ignored that

---

prior criminal record to the jury. Ransom then testified outside the jury's presence, apparently on the assumption that his testimony would provide the trial judge with an evidentiary foundation for ruling on legality of the search. Following Ransom's testimony, defense counsel told the court that he had no objection to legality of the search, since "People vs. Thompson is definitely authority for the search."

condition. The parole agent was not engaged in administering his supervisorial function. He had not instigated the search nor evinced any official interest in it except in his role as a "front" for the police.[2] His presence was a ruse, calculated to supply color of legality to a warrantless entry of a private dwelling. The Fourth Amendment hardly lends itself to such totemism. The search was primarily aimed at ordinary law enforcement, not parole administration. Law enforcement searches are heartily to be encouraged, but by means sanctioned by the Constitution. Defendant was in jail and the Chico police had ample time and opportunity to secure the search warrant mandated by the Fourth Amendment. They chose the parole agent rather than a search warrant as their ticket of entry to the apartment. The search was illegal and its evidentiary products inadmissible.[3] Evidence which awaited the police, which had been practically and legally obtainable through a search warrant, was now tainted by the pursuit of unconstitutional means. Such a taint is not temporary. ■ An unconstitutional seizure places the articles permanently beyond the pale of admissibility. Thus vital evidence may be figuratively destroyed by mistaken tactics and a well-founded prosecution doomed to failure through the choice of constitutionally dubious investigative procedures.

■ In not objecting to the search or its product, defendant's trial counsel told the trial judge that the search had the sanction of *People* v. *Thomspon, supra,* thus that he had no basis for an objection. In this, he erred. In *Thompson* the parole agent learned that the defendant (a parolee) was in jail on a robbery charge. Knowing that the man had a potential for violence, the agent decided to search his hotel room for weapons and enlisted the aid of a police detective. The court held that the search was conducted "on behalf of the department [of Corrections]" and sustained its legality. (252 Cal.App.2d at p. 86.) That holding does not

---

[2]On direct examination outside the jury's presence, the parole agent described the purpose of the search as follows:

"Q. What was your purpose in making the search? A. It is routine, as far as my job is concerned, as much as if nothing had been found to incriminate a man under my supervision, or if evidence was found to incriminate him, it is a two-way process.

"Q. Now at that time that you went to his apartment, you were aware that he was being held by the Chico Police for investigation of burglary? A. Yes, sir, suspect.

"Q. And was it your purpose, or one of your purposes to seek evidence of the burglary, or the lack of evidence?

"A. It was."

[3]This holding places no impediment upon cooperation between police and parole agencies. It does mean that when the search is instigated by the police for law enforcement purposes, Fourth Amendment principles must govern judicial use of the resulting evidence. (See, e.g., *Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034]; *Warden* v. *Hayden* (1967) 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642]; *People* v. *Sandoval,* 65 Cal.2d 303 [54 Cal.Rptr. 123, 419 P.2d 187]; *People* v. *Terry,* 61 Cal.2d 137 [37 Cal.Rptr. 605, 390 P.2d 381].)

extend to the present search, which was conducted on behalf of the police rather than the parole agency.

Did the attorney's erroneous concession deprive defendant of the effective aid of counsel? ██ "It is counsel's duty to investigate carefully all defenses of fact and of law that may be available to the defendant, and if his failure to do so results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he was entitled." (*People* v. *Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) ██ Defendant's attorney had indulged in a careless and indiscriminate reading of the *Thompson* decision and had failed to observe the pivotal element which distinguished that case from this. As the result of that failure stolen articles which should have been excluded, were admitted in evidence and direct appellate attack precluded by the lack of defense objection.

The loss of a defense may result in a trial "in which only one side of the case is heard" (*People* v. *McDowell,* 69 Cal.2d 737, 751 [73 Cal.Rptr. 1, 447 P.2d 97]). In that kind of case ascertainment of the damage's crucial role is relatively simple. The present situation is more complex, for the failure to object to evidence neither admitted guilt nor prevented a genuine contest. In this kind of case the reviewing court is called upon to sift the record to ascertain the relative incriminatory impact of the failure to object. (See, e.g., *People* v. *Ibarra, supra,* 60 Cal.2d at pp. 465-466; *People* v. *Honea,* 257 Cal.App.2d 259, 262-265 [64 Cal.Rptr. 628]; *People* v. *Wilson,* 254 Cal.App.2d 489, 494 [62 Cal.Rptr. 240].)

██ Relative to the burglary of the 99 Club, there was no doubt that the event had occurred during a span of time measured by a few hours. At some time during that time span, two eyewitnesses had seen defendant wearing white gloves and fetching articles to his station wagon outside the 99 Club. A lawful search of the station wagon after his arrest revealed cigars corresponding to one of the four varieties stolen from the Club, plus white gloves, a loaded pistol and makeshift cloth mask. Such was the prosecution evidence exclusive of the goods illegally uncovered in his apartment. The defense was weak, consisting of several ineffectual witnesses and defendant's sworn denial. The latter, in turn, was met by impeaching evidence of a series or prior felony convictions. The state of the evidence, exclusive of the illegally seized articles, made a guilty verdict reasonably probable.

The illegally seized, stolen goods transformed reasonable probability into virtual certainty. The valid automobile search had uncovered only one variety of cigar, while the invalid apartment search produced three more varieties, completing an exact matching with the four varieties stolen from

the 99 Club. The inadmissible evidence included items stolen from the Lee dwelling as well. This single batch of articles formed a spread of incrimination extending simultaneously and inextricably to both burglaries. Defendant was now tabbed as a burglarious character, and lay jurors would tend, however unconsciously, to inject guilt of the one burglary into their deliberations on the other. In the particular circumstances a conclusion that the yielded defense was not crucial in relation to count I would involve the reviewing court in inappropriate speculation. Retrial before another jury is preferable.

The lost defense reflected injury not only in the trial court but on appeal as well. ▆▆▆ Had an objection been made and overruled, reversal on appeal would have followed, since an appellate court may affirm in the face of federal constitutional error only when there is no reasonable possibility that the error contributed to the verdict. (*Chapman* v. *California,* 368 U.S. 18, 21-24 [17 L.Ed.2d 705, 708-710, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

▆▆▆ In this case the lawyer was not unprepared. (Cf. *In re Williams,* 1 Cal.3d 168 [81 Cal.Rptr. 784, 460 P.2d 984].) He had read the pertinent case law, misinterpreted it and imprudently failed to give his client a fighting chance. His failure to object was not the result of a tactical choice but of misinterpretation of the law. (See *People* v. *McDowell, supra,* 69 Cal.2d at p.746; *People* v. *Welborn,* 257 Cal.App.2d 513, 522-523 [65 Cal.Rptr. 8].) Even if admissibility were arguable, his duty was to fight for his client, not to open the gate to an overwhelming flood of dubiously admissible, damning evidence. He should have put the onus of an adverse ruling on the trial judge rather than himself. ▆▆▆ The heavy impact of the objectionable evidence and the avoidable character of the concession made the lost defense "crucial" as to count I.

▆▆▆ Aside from defendant's suspicious activity at the time of his arrest, his connection with the burglary of the Lee dwelling (count II) rested on his possession of the portable television set, rifle, shotgun, clock radio, and travel alarm belonging to the Lees and discovered through the unconstitutional search of his apartment. No eyewitness and no other circumstantial evidence connect him with that crime. The attorney's failure to object caused loss of a crucial defense to count II.

▆▆▆ The material found in the illegal search of defendant's apartment did not include any articles stolen in the Shrader burglary (count III). Found in the valid search of defendant's station wagon were a .32 caliber pistol taken from the Shrader home, as well as a $2 bill and raffle tickets resembling property of the Shraders. Found in a search of defendant's mother's home, made with her consent, were an electric shaver and

phonograph records stolen from the Shraders. The lost defense was not crucial in relation to count III.

Although possession of stolen goods is not alone sufficient evidence of guilt, it is so strongly incriminating that only slight corroboration is needed. (*People* v. *Citrino, supra,* 46 Cal.2d at pp. 288-289.) Defendant's evasiveness, his falsehoods when officer Summers questioned him before the arrest and his possession of the makeshift cloth mask, adequately corroborated the evidence that he possessed articles stolen from the Shraders.

The judgment of conviction is reversed as to count I and count II and affirmed as to count III.

Regan, J., and Janes, J., concurred.

A petition for a rehearing was denied January 8, 1970, and respondent's petition for a hearing by the Supreme Court was denied February 11, 1970. McComb, J., and Burke, J., were of the opinion that the petition should be granted.