879 P.2d 1057

**STATE of Hawai'i, Plaintiff–Appellant,**

v.

**Lenee PROPIOS, Defendant–Appellee,**

**and**

**Louis Palea, Defendant.**

**No. 16005.**

Supreme Court of Hawai'i.

Sept. 6, 1994.

James H.S. Choi, Deputy Prosecuting Atty., on the briefs, Honolulu, for plaintiff-appellant.

Seth Thompson, Shigetomi & Thompson, on the briefs, Honolulu, for defendant-appellee.

Before KLEIN, Acting C.J., RAMIL, J., and JAMES S. BURNS, Intermediate Court of Appeals Chief Judge, in Place of MOON, C.J., recused, WALTER M. HEEN, Associate Judge, in Place of LEVINSON, J., recused, and VIRGINIA REA CRANDALL, Circuit Court Judge, assigned by reason of vacancy.

KLEIN, Acting Chief Justice.

Defendant–Appellee Lenee Propios and co-defendant Louis Palea were charged, on April 26, 1991, with Promoting a Dangerous Drug in the Second Degree in violation of Hawai'i Revised Statutes (HRS) § 712–1242(1)(b)(i) (Supp.1992) and Unlawful Use of Drug Paraphernalia in violation of HRS § 329–43.5(a) (Supp.1992). The circuit court granted Propios's motion to suppress evidence and denied her motion to suppress statements.[1] The Prosecution timely filed a notice of appeal on March 20, 1992, arguing

---

1. Co–Defendant Palea also filed a motion to suppress evidence, but withdrew the motion and pled guilty.

that the court committed reversible error in granting the motion to suppress by basing its decision on erroneous findings of fact and conclusions of law. We affirm.

### I. Facts

On March 1, 1991, Propios was sentenced to probation after pleading guilty to charges of Promoting a Dangerous Drug in the Third Degree, HRS § 712–1243(1) (Supp.1992), and Unlawful Use of Drug Paraphernalia, HRS § 329–43.5(a). The terms of her probation, in pertinent part, required Propios to comply with the following conditions:

1. You must not commit another federal or state crime during the term of probation;

\* \* \* \* \* \*

7. Your further special conditions of probation are as follows:

\* \* \* \* \* \*

C. Immediately undertake to and then enter and remain in a residential drug and alcohol treatment program as deemed appropriate by the Adult Probation Division, and if so directed, remain in treatment until clinically discharged with the concurrence of the Adult Probation Division;

\* \* \* \* \* \*

E. Refrain from the use of alcohol and/or illicit/unprescribed drugs or substances;

F. Submit to drug and alcohol testing at your own expense as directed by the Adult Probation Division, with the

provision that a positive finding or a failure to provide a specimen within two hours of instruction may be considered prima facie evidence of probation violation; [and,]

G. *Submit at reasonable times to search, conducted in a reasonable manner by the probation officer of your person, residence, vehicle or other sites and property under your control, with or without a warrant, and that any contraband found or observed thereby may be seized[.]*

(Emphasis added.) *See also* HRS §§ 706–624(1)(a), (2)(i), (2)(k), (2)(m) & (2)(n) (Supp. 1992).

Propios's first meeting with her Adult Probation Division (APD) officer, Gail Muranaka, occurred immediately following sentencing. Propios admitted that she had used cocaine at 4:00 a.m. that morning and, thereafter, underwent her first urinalysis. The test results came back positive for both cocaine and marijuana.[2]

On March 22, 1991, Propios had a second interview with Muranaka. Propios told Muranaka that it was difficult for her to overcome her drug habit because her live-in boyfriend, Louis Palea, was dealing drugs from their home and supplying her with drugs. Propios took her second urinalysis on this date.[3] During this contact, a third interview was set for April 2, 1991. On March 25, 1991, the test results came back positive for cocaine.

Based on the two positive test results, Muranaka met with Eleanor Kekauoha,[4] who

---

2. Although it is not essential to our determination, we note that a test administered on the same day an individual is placed on probation is of questionable value as grounds for revocation because the probationer has not yet had an adequate opportunity to correct his or her behavior.

3. Prior to this date, Muranaka and Propios mutually agreed to defer Propios's entry into a residential drug abuse treatment facility, at least until she returned from a family visit to Florida. Propios called Muranaka to set up a second appointment shortly after returning but before the date expected by Muranaka. During that call, Propios informed Muranaka that she had attempted to contact a treatment facility without success. Muranaka suggested two alternatives,

including the Hawai'i Addiction Center, with which Propios apparently made an appointment prior to her March 22nd meeting with Muranaka. In other words, although Propios's admitted drug use violated the express terms of her probation, she did not have an adequate opportunity to enroll in a rehabilitative program.

4. When first called as a witness on October 4, 1991, she identified herself as "Eleanor Kekuewa" according to the transcript. Subsequent transcriptions by another court reporter on October 16 and 21, 1991, which include further cross-examination as well as redirect and recross of this witness, and the circuit court clerk's minutes for October 4, 1991, identify her as Eleanor Kekauoha.

was the supervisor in charge of the APD search unit. Muranaka told Kekauoha that Propios had tested positive for cocaine and would be a good "search" candidate. Kekauoha began organizing a search to be conducted during Propios's scheduled interview on April 2, 1991. Kekauoha also called the police to help provide security and to detain Propios.

On April 1st, there was a meeting between Muranaka, Kekauoha and Honolulu Police Department (HPD) officer Thomas Carreiro (Officer Carreiro). Muranaka informed Officer Carreiro that Propios was intravenously using cocaine and that her source was her live-in boyfriend who was a drug dealer.

On April 2, 1991, Propios met with Muranaka for her scheduled interview, after which, Muranaka led her to a conference room where Officer Carreiro was waiting with Kekauoha and approximately four other APD officers. Two other police officers may have also been present in the conference room.

Propios was then taken to an interview room by Kekauoha and another APD officer, where a strip search was conducted. Propios's clothes and purse were also searched. The APD officers did not find any contraband on Propios or in her belongings.

Subsequently, the APD officers, police officers and Propios proceeded to Propios's residence. The police entered the residence first to conduct a protective sweep. Once the sweep was concluded, the police officers were instructed to "back off" so the APD officers could take photographs. Co-defendant Palea was detained in the residence during this search.

The APD officers uncovered cocaine, syringes, scales, large sums of money and other household items used in connection with the sale of drugs. There is no direct evidence that the police officers actively participated in the search, other than to provide security. The items seized, however, were subsequently handed over to the police. Propios and Palea were later charged with Promoting a Dangerous Drug in the Second Degree and Unlawful Use of Drug Paraphernalia.

## II. *Discussion*

### A. Warrantless Probationary Searches Under Hawai'i Law

■ Although probationers are subject to restrictions to which the average person is not subjected, a probationer still maintains the right to a significant degree of privacy. In *State v. Fields*, 67 Haw. 268, 686 P.2d 1379 (1984), this court held that a probationer, like a parolee, may be subjected to warrantless searches by her probation officer. *Id.* at 279–81, 686 P.2d at 1388–89. The warrantless search must be reasonable, however, even if carried out as a condition of probation. To be reasonable, the facts of each case must show that the search was justified by a reasonable suspicion supported by specific and articulable facts that probation was being violated. *Id.* at 281, 283, 686 P.2d at 1389, 1390.

Because this court has determined that reasonable warrantless searches of probationers are constitutional, the only question remaining is whether the search of Propios's residence was reasonable. The general rule is that

> [warrantless] search[es] carr[y] an initial presumption of unreasonableness. To overcome this presumption, the State must show that the facts of the case justified the ... search[ ] without a warrant and that *the search itself was no broader than necessary to satisfy the need which legitimized departure from the warrant requirement in the first place.*

*State v. Kaluna*, 55 Haw. 361, 363, 520 P.2d 51, 55 (1974) (citations omitted and emphasis added).

In this case, the question of reasonableness centers on the participation of the police in the search. This is a question of first impression in Hawai'i. We have stated previously, however, that "[t]here unquestionably is a difference 'between correctional supervision which seeks to restore a released offender to society through rehabilitation, and supervision which seeks ... to investigate and prosecute criminal activity.'" *Fields*, 67

Haw. at 278, 686 P.2d at 1388 (citation omitted).[5]

### B. Reasonableness of Police Participation

Although other jurisdictions have not given explicit attention to the distinction between rehabilitative and prosecutorial purposes that we have drawn in *Fields*, case law supports an examination of the subjective purpose of a warrantless probationary search. For example, police participation in a warrantless residential search of a parolee has been deemed reasonable so long as the underlying search was conducted for a supervisory purpose, and not as a subterfuge for subsequent criminal prosecution.[6] *People v. Johnson*, 43 Cal.3d 296, 730 P.2d 131, 233 Cal.Rptr. 562 (1987), *cert. denied*, 493 U.S. 829, 110 S.Ct. 98, 107 L.Ed.2d 62 (1989). The court in *Johnson* held that a warrantless parole search is reasonable if there is a nexus between the search and the parole process, and the search is conducted after a finding of reasonable suspicion, based on articulable facts indicating that parole has been violated. *See id.* (citing *People v. Burgener*, 41 Cal.3d

505, 714 P.2d 1251, 224 Cal.Rptr. 112 (1986)).[7]

There is a nexus between the search and the parole process if the search is conducted to obtain evidence of a parole violation, but not if the purported parole purpose is merely a "ruse, calculated to supply color of legality to a warrantless entry of a private dwelling[.]" *Id.* 43 Cal.3d at 316, 730 P.2d at 143, 233 Cal.Rptr. at 574. In California, therefore, police participation does not invalidate an otherwise proper parole search because a parole officer is justified in enlisting the aid of the police. *Id.* at 316, 730 P.2d at 143, 233 Cal.Rptr. at 574.[8]

In *Johnson*, a police officer called the defendant's parole officer and told him that the defendant was a suspect in a rape and homicide investigation. *Id.* 43 Cal.3d at 312, 730 P.2d at 140, 233 Cal.Rptr. at 571. The parole officer then asked the police officer to "assist [him] in conducting a parole search [of the defendant's] residence for other possible fruits of the crime that show he may have violated his parole." *Id.* The search was conducted by the parole officer and three police officers. The court in *Johnson* held

---

**5.** *Fields* involved a facial challenge to a condition of probation compelling the probationer to submit "*at all times* during the period of her probation to a warrantless search of her person, property and place of residence for illicit drugs and substances *by any law enforcement officer* including her probation officer." *Id.* 67 Haw. at 271, 686 P.2d at 1383–84 (emphasis added). We set aside the condition because it was inconsistent with the objectives of probation as well as constitutional demands.

**6.** Some of the cases discussed herein involve parole searches, whereas the instant case involves a probationary search. We discern no distinction for purposes of this case.

**7.** In *Burgener*, the Supreme Court of California held that there is a clear "parole supervision purpose in a search undertaken to obtain evidence of a parole violation." 41 Cal.3d at 536, 714 P.2d at 1271, 224 Cal.Rptr. at 133. In a footnote reference to this statement, the court noted that "[t]o the extent that it is inconsistent with this conclusion [*People v. Coffman*, 2 Cal. App.3d 681, 82 Cal.Rptr. 782 (1969)] is disapproved." *Id.* 41 Cal.3d at 536 n. 14, 224 Cal. Rptr. at 133 n. 14, 714 P.2d at 1271 n. 14.

The court later explained that, in *Burgener*, it had disapproved *Coffman's* apparent implication "that parole supervision purposes and police investigation purposes are mutually exclusive." *Johnson*, 43 Cal.3d at 316 n. 11, 730 P.2d at 144 n. 11, 233 Cal.Rptr. at 575 n. 11.

*Coffman* involved a parolee (convicted of an unstated crime) who was arrested for burglary. The police subsequently called Coffman's parole agent and asked him to accompany them for a search of Coffman's apartment. The State of California Attorney General argued "that the parole officer's physical presence or his delegation of authority to the police validates the search without regard to its instigating source." 2 Cal. App.3d at 688, 82 Cal.Rptr. at 786. The court held that the search was illegal because "[t]he parole agent was not engaged in administering his supervisorial function ... [rather, t]he search was primarily aimed at ordinary law enforcement[.]" *Id.* at 689, 82 Cal.Rptr. at 786.

**8.** Nonetheless, "*Coffman* [still] stands for the proposition that *absent a proper parole purpose*, the parole agent's mere presence or authorization is ineffective to validate the search." *Johnson*, 43 Cal.3d at 316 n. 11, 730 P.2d at 144 n. 11, 233 Cal.Rptr. at 575 n. 11. (emphasis added). "A parole search therefore must be directly and closely related to parole supervision in order to avoid unreasonable invasion of the privacy interests of the parolee and those with whom he [or she] resides." *Burgener*, 41 Cal.3d at 532–34, 714 P.2d at 1269, 224 Cal.Rptr. at 131.

that the search was reasonable, but remanded for a new trial on other grounds. *Id.* at 317, 730 P.2d at 144, 233 Cal.Rptr. at 575. In so holding, the court noted that there is a clear "supervis[ory] purpose in a search undertaken to obtain evidence of a parole violation" notwithstanding a subsequent criminal prosecution premised upon evidence collected during the warrantless parole search. *Id.* "[N]either the fact that police initiated the inquiry which led to the search, nor the fact that defendant was in custody on an unrelated charge at the time," makes the parole officer's authorization a "ruse," or "undermines the validity of the search." *Id.*

The United States Court of Appeals for the Ninth Circuit has affirmed this view, rationalizing that the aid of the police may be requested by parole officers in order to provide protection, to help in apprehending the parolee, and to *investigate the parole violation. United States v. Butcher,* 926 F.2d 811, 815 (9th Cir.), *cert. denied,* 500 U.S. 959, 111 S.Ct. 2273, 114 L.Ed.2d 724 (1991).

The decision in *Butcher* expanded upon a case decided sixteen years earlier, *United States v. Consuelo–Gonzalez,* 521 F.2d 259 (9th Cir.1975). In *Consuelo–Gonzalez,* the Federal Bureau of Narcotics and Dangerous Drugs received information that the defendant was actively engaged in the importation and sale of heroin. The defendant had previously been convicted of heroin smuggling and was subject to search of her person and property by "any law enforcement officer" as a condition of probation. Federal agents, who were not probation officers, commenced a search of the defendant's residence and found incriminating evidence. At trial, defendant's motion to suppress the evidence was denied and she was later found guilty of possessing heroin with intent to distribute. The United States Court of Appeals for the Ninth Circuit reversed, stating that:

> [p]robation authorities [do] have a special and unique interest in invading the privacy of probationers. [However, t]his special and unique interest does not extend to law enforcement officers generally.... [S]earches of probationers not otherwise in compliance with [constitutional] standards

[must] be by, or under the immediate and personal supervision of probation officers. *Id.* at 266. The court added that "mutually beneficial cooperation between probation officers and other law enforcement officials" is permissible. *Id.* at 267. "However, under no circumstances should [such] cooperation .... be permitted to make the probation system 'a subterfuge for criminal investigations.'" *Id.*

In *Butcher,* the defendant was arrested for a parole violation. His residence was subsequently searched by a Special Agent of the California Department of Corrections, who was not his parole officer, and two sheriffs. The court held that cooperation between the Special Agent and the sheriffs was justified, because the Special Agent initiated the search in the regular course of his duties and requested the aid of the sheriffs. The court further held that the search need not be effected by the defendant's parole officer, so long as it is conducted by an agent whose function it is to investigate and apprehend parole violators. *Id.* In any event, whether or not a particular search is improper "is a question of fact subject to the clearly erroneous standard of review." *Consuelo–Gonzalez,* 521 F.2d at 267.

An example of an improper search is provided in *Commonwealth v. Brown,* 240 Pa.Super. 190, 361 A.2d 846 (1976). In *Brown,* the Superior Court of Pennsylvania suppressed evidence recovered during a search of the defendant's home by his parole officer and two police officers. A counselor at a local community treatment center told defendant's parole officer that he thought the defendant had stolen goods in his home. During the parole officer's next visit at the defendant's home, he saw a television and a stereo. The parole officer then obtained a description of the stolen television and stereo from the victim. Subsequently, the victim told defendant's parole officer that he wanted the police to take action. The parole officer returned to the defendant's home with two police officers and the victim. The police officers were present to help the parole officer arrest the defendant, and the victim was there to identify the stolen goods.

The court held that "[t]he parole agent's physical presence, even his nominal conduct of the physical acts of search, does not signalize validity. The *purpose* of the search, not the physical presence of a parole agent, is the vital element. *Id.* at 197, 361 A.2d at 850 (quoting *People v. Coffman,* 2 Cal.App.3d 681, 82 Cal.Rptr. 782 (1969)) (emphasis added). The court went on to state that the parole officer was no longer acting with a parole purpose, in other words, merely collecting evidence of a parole violation. *Id.* 240 Pa.Super. at 198, 361 A.2d at 850. The parole officer had "switched hats" and was, in reality, collecting evidence to charge the defendant with a new crime.[9] *Id.* Once the parole officer "switched hats," he could no longer justify the warrantless search and should have obtained a warrant. *Id.*

In other words, a warrantless probationary search premised upon an initially valid rehabilitative purpose may nonetheless become tainted by subsequent abuse of that privilege.

### C. Subterfuge Notwithstanding Objectively Valid Purpose

■ Given the teachings set forth in the aforementioned cases, the search of Propios's residence was unreasonable notwithstanding the existence of an objectively valid probationary purpose, because the avowed purpose was in reality a subterfuge designed to facilitate a criminal investigation. *See Fields,* 67 Haw. at 278, 686 P.2d at 1388 (noting a distinction between correctional supervision and criminal investigation for prosecutorial purposes).

Propios admitted to her probation officer that she (Propios) had injected cocaine and was having trouble overcoming her drug habit because her live-in boyfriend (Palea) was a drug dealer. These admissions constituted specific and articulable facts giving rise to a reasonable suspicion that Propios had violated her probation and were, therefore, sufficient to support a warrantless probationary search. *See id.* at 280, 686 P.2d at 1389 (concluding that "quests for dangerous drugs and substances [were permissible, g]iven [the probationer's] known proclivity for involvement in the trafficking of illicit drugs" because such searches were sufficiently connected to her rehabilitation).

In the instant case, the APD officers contacted the police in order to obtain protection and assistance in detaining Propios and Palea. Both Officer Carreiro and Kekauoha testified that the police were contacted because the APD officers were dealing with an alleged drug dealer and wanted protection based on the potential for danger. This was not an unreasonable request.

The search was purportedly conducted by APD officers whose function it is to investigate and apprehend probation violators. APD officers must obtain evidence to support a finding that probation has been violated.[10] It would be unreasonably dangerous for an APD officer to enter the home of an alleged drug dealer to conduct a warrantless search without the aid and protection of police officers.

In this case, however, the trial court found that the police "took over" the search nominally conducted by the APD officers in order

9. In *Brown,* the parole officer knew the victim wanted the police "to take action" and even went as far as to take the victim and the police on the second visit to identify the goods and to effect arrest. *Id.* at 193–94, 361 A.2d at 848. It is clear that the parole officer in *Brown* was acting as a "police officer" and was obtaining evidence for the new charge of burglary. *Id.* at 197–98, 361 A.2d at 850.

10. Although Muranaka did testify that APD usually waits for two positive urinalysis tests before they begin revocation proceedings, the existence of two positive test results should not preclude APD officers from obtaining additional evidence of a probationary violation. Muranaka, for example, testified that a decision by the APD whether or not to initiate revocation was "pend-

ing what happened at the search." *See* HRS § 706–625(a) (the court has discretion to revoke probation upon application by the probation officer, the prosecuting attorney, the defendant, or upon its own motion); HRS § 706–625(c) (the court must revoke probation only where "the defendant has inexcusably failed to comply with a substantial requirement ... or has been convicted of a felony"). The court's discretionary authority provides ample justification for the APD to seek additional evidence to support an application for the revocation of Propios's probation. Thus, the timing of the search at issue here does not signal an improper motive on APD's part nor does it render the search unreasonable in and of itself.

to gather evidence for use in a criminal prosecution. Prior to the search, the police had "ample time to secure the search warrant mandated by the [Constitution]." *See Johnson,* 43 Cal.3d at 316, 730 P.2d at 143, 233 Cal.Rptr. at 574. The testimony at trial led the trial judge to conclude that the police engaged in a calculated effort to avoid the traditional warrant requirement. Instead of obtaining a warrant, the police relied upon circumstances justifying a warrantless probationary search as a "subterfuge" or "ruse" to advance law enforcement purposes.

Although we discern an objectively reasonable basis for undertaking the warrantless probationary search, the evidence obtained therefrom is nonetheless tainted based upon the trial court's finding that the search was actuated by a subjectively improper purpose. In other words, the warrantless probationary search, though justified in the abstract, was unreasonable because of the trial court's conclusion that it provided a subterfuge for an otherwise invalid search.

### D. Propriety of Search is a Question of Fact

The state and federal cases cited in section II.B., *supra,* all apply the same basic principle: police officers may provide appropriate assistance in warrantless parole or probationary searches, but cannot conduct nominally probationary searches as a "ruse" to facilitate the gathering of evidence for prosecution of new criminal acts. Notwithstanding the existence of an objectively valid probationary purpose, we hold that a warrantless probationary search is unreasonable if it is conducted for a subjectively improper purpose.

As indicated previously, whether a particular search is improper "is a question of fact subject to the clearly erroneous standard of review." *Consuelo–Gonzalez,* 521 F.2d at 267. The trial court's relevant findings in the instant case are discussed below.

### 1. Findings of Fact

■ The State argues that six of the circuit court's allegedly relevant findings of fact (FOF) are clearly erroneous. The first is

FOF number 5 (FOF–5), which states, in part:

> After this second test proved positive, Muranaka made arrangements for Propios to come in to Adult Probation for an April 2nd appointment.

This FOF is clearly erroneous because APD officer Muranaka testified that the April 2nd interview was scheduled during Defendant's interview on March 22nd. The error, however, is harmless.

■ The second FOF in question is FOF–8:

> Kekauoha contacted Officer Thomas Carreiro (hereafter "Carreiro"), and advised him that Propios was coming in to Adult Probation for an April 2, 1991 appointment, that Carreiro was to assist with this case and that *he should anticipate a search* because Propios violated probation. After Carreiro was so advised by Kekauoha, Sgt. Marvin Makiya, assigned *him* to the case as lead investigator. Sgt. Makiya gave Carreiro permission to "run with it" and advised him that Propios was not the only target, since Palea was also a target of an investigation.

(Emphasis added.) The State argues the first sentence is incorrect because Officer Carreiro testified that APD supervisor Kekauoha called him and told him that "she" anticipated a search and would keep him "posted and inform [him]˙if any development came forward as far as scheduling and such." Based on this testimony, however, FOF–8 is not clearly erroneous. Because Kekauoha told Officer Carreiro that she anticipated a search, the court could infer that she also told him to anticipate a search.

■ The State also argues that the final sentence of FOF–8 is in error *for two reasons.* First, the State argues that Officer Carreiro was not told "to run with it" by Sgt. Makiya, because Carreiro actually testified that Sgt. Makiya "gave [him] the green light to go ahead with it." Based on this testimony, the finding is imprecise because Officer Carreiro did not expressly testify that he was told "to run with it[.]" However, this phrase simply captures the fact that Officer Carreiro was given permission to go ahead with the search, and as such, has the same meaning as

being given the "green light"; therefore, the error is harmless.

■ The second point of error is that Officer Carreiro was not told by Sgt. Makiya that co-defendant Palea was also a target of the search. Officer Carreiro testified that he found out about Palea during the April 1st meeting with Kekauoha and Muranaka. The court clearly erred, therefore, in finding that Officer Carreiro found out about Palea through Sgt. Makiya. This error is also harmless.

■ The third FOF in question is FOF–9. FOF–9 states, in relevant part:

[Officer] Carreiro had conducted from 10 to 20 warrantless searches.

The testimony regarding this FOF is as follows:

Q: In how many of these kinds of searches were the probation officers conducting searches with you and other officers? How many other searches of this type have you participated in?

A: I participated in maybe, gee, ten to 20 of these warrantless searches.

The word "conducted" in FOF–9 implies that Officer Carreiro's presence at these ten to 20 searches was for non-probationary purposes. Officer Carreiro testified, however, that he merely "participated" in the searches. Nonetheless, the testimony of the Prosecution's witnesses can be read to support the circuit court's conclusion that the police, in fact, played a more active part in the search at issue in this case.[11] Although the witnesses' testimony also admits of less odious

interpretations, it is well-settled that "an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trial judge." *State v. Furutani,* 76 Hawai'i 172, 174, 873 P.2d 51, 53 (1994) (citing *Amfac, Inc. v. Waikiki Beachcomber Investment Co.,* 74 Haw. 85, 117, 839 P.2d 10, 28, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992)). Therefore, FOF–9 is not clearly erroneous.

The State argues FOF–15 is also in error. It reads, in part:

[(a)] After the body search, Propios was taken to the conference room across from Muranaka's office and left there in the presence of police officers and Adult Probation staff.

[(b)] Muranaka stated that "the police took over" at this time.

. . . . .

[(c)] Seated next to Carreiro, Propios made statements implicating her boyfriend Palea in drug trafficking and confirming the existence of contraband at the residence where they both lived.

■ The State argues that part (a) is in error, because Officer Carreiro testified that he was the only police officer in the conference room when Defendant was brought in. The State recognizes that Kekauoha testified that there were "police officers" in the conference room, but adds that her testimony was unclear and that she could only specifically remember Officer Carreiro being present.[12] Meanwhile, Muranaka testified that

---

11. Officer Carreiro testified that he was "assigned [as the 'lead investigator'] to *conduct* an investigation with the Adult Probation Division concerning two probationers they had in their jurisdiction." Officer Carreiro also assigned a "case agent for forfeiture proceedings that would take place." The Prosecutor's attempt to recast this testimony is revealing. He sought clarification from Officer Carreiro that the latter agent was assigned in the event that "there was anything to forfeit," and Carreiro responded, "Right." Then the Prosecutor asked, "In fact *during the course of the search, he initiated—Well* there was forfeiture of property here; right?" Officer Carreiro responded, "At the conclusion of the search." Finally, the Prosecutor elicited a list of items "*[t]argetted [sic] for forfeiture, as part of this April 2nd, 1991 search[.]*"

While explaining the role of the police in the search (e.g., detaining the probationer), Kekauoha said, "This is throughout the search *they are in charge of—maybe that's the wrong word to use.* Whatever the function is that is along the lines of providing security and holding the person in there or I would say under their detainment, that's the only word I can think of."

APD Officer Muranaka testified that Kekauoha informed her that she (Kekauoha) would make arrangements with HPD to "have police officers assigned to *do a search* with the probation officers."

12. The conflicting testimony might be explained by the fact that there was more than one police officer in the conference room during the briefing that preceded the body search of Propios.

she escorted Defendant to a conference room where the *police officers* were waiting. Because there is conflicting evidence, and the circuit court judge must weigh the credibility of the witnesses,[13] part (a) is not clearly erroneous. *Furutani*, 76 Hawai'i at 180, 873 P.2d at 59 (citing *Amfac*, 74 Haw. at 117, 839 P.2d at 28).

■ In part (b), the court found that Muranaka stated that "the police took over." The relevant testimony is as follows:

Q: And after your meeting with the defendant itself, who was in charge of her then after your meeting?

A: The police officers were in this conference room which is right across my office and I just escorted her to the conference room and *the police to go [sic] over and started talking to her at that point.*

Q: What about Kekauoha, was she there?

A: Kekauoha was there, too.

Q: Okay. Now, when you—did Kekauoha talk with the defendant after you escorted her to, if you remember, to the meeting room where everybody was?

A: I believe so.

(Emphasis added.) Muranaka subsequently testified that she was not present during any of the conversations the police or APD officers had with Defendant, nor was she present during the search of Defendant's home.

Later, on cross examination, Muranaka again addressed a question concerning the role of the police in the conference room following Propios's body search:

Q: And there you left it [sic] into the custody of the police officers?

A: Yes.

Based on this testimony, the court could have inferred that the police "took over[.]"

A transcript of the proceedings indicates that the circuit court found that "Ms. Muranaka stated that, quote, the police took over, end quote, at this time." According to our review of the transcripts, at no time did Muranaka state "the police took over." The court reporter, however, may have misreported the testimony by indicating that Muranaka said "the police to go [sic] over." In any event, the circuit court's finding is not clearly erroneous because it reflects the essence of Muranaka's testimony. Once the police took over, the search was no longer related to Propios's prior conviction or to her rehabilitation as is required by law. *See Fields*, 67 Haw. at 278–79, 686 P.2d at 1388 (citing *Consuelo–Gonzalez*, 521 F.2d at 265).

■ The State argues that part (c) is erroneous because Defendant did not "confirm" the existence of drugs or contraband in her home. While it is true that Defendant never said there were drugs in her home, the court could infer that she had, in fact, confirmed the presence of drugs by stating that Palea dealt drugs out of their home. Part (c), therefore, is not clearly erroneous.

■ The State argues that FOF–17 is also in error. It reads as follows:

Upon arrival at the residence, the police were to be under the supervision of Kekauoha, who was also in charge of the Adult Probation search team. Kekauoha had briefed the police prior to their arrival, *advising them that drugs would be on the premises* and that a search was necessary because of the dirty urine test results of Propios.

(Emphasis added.) The State argues that this finding is clearly erroneous because APD supervisor Kekauoha did not "make a positive statement" during the briefing regarding the presence of drugs.

Kekauoha, referring to herself and four other probation officers, testified that there was "at least one police officer with each of us." This testimony could be read to support the police officers' role of providing security, however, the apparent conflict with Officer Carreiro's testimony (suggesting at most three officers in the house: Carreiro, Mapu and Miranda) diminishes the latter's credibility.

---

**13.** Officer Carreiro testified that after he and police officers Miranda and Mapu secured the house, "the police officers were instructed to back off." Officer Carreiro further "told the police officer [sic] to stay outside in the courtyard, . . . so the *police officers* [were] out there securing the courtyard, the living room area, keeping a watchful eye out on the street while the adult probation officers take the pictures and start going through the search." (Emphasis added.)

Kekauoha testified that specific information pertaining to Propios and Palea was discussed during the briefing. She did not elaborate, however, as to these specifics.[14] Based on this testimony, FOF-17 is clearly erroneous because there is no evidence to support a precise statement by Kekauoha to the police "that drugs would be on the premises[.]" The error is harmless, however, because there is sufficient evidence from which the court could reasonably infer that the police were aware, based on information obtained from the APD, that drugs would *probably* be found on the premises during the search.

There was evidence of the following: Muranaka informed Officer Carreiro of drug use by Propios and that her live-in boyfriend was her source; the police were contacted because a suspected drug dealer was involved; Carreiro found out about Palea during an April 1st briefing with Kekauoha;[15] at this briefing, Kekauoha mentioned, but did not elaborate upon, certain "specific" information regarding Propios and Palea; and, Carreiro assigned an agent for likely forfeiture proceedings (based upon the anticipated discovery of drugs in the home).

■■ Finally, the State argues that FOF-19 is in error. It reads:

> After the police secured the residence, the Adult Probation team commenced their search. The police did not assist in this search, although Carreiro's understanding was that "it was arranged that whatever contraband was found, HPD could *seize* since he would end up conducting the investigation." Carreiro also understood that the police were there to secure not only contraband, but also evidence of other crimes. Such evidence would be released to him by Kekauoha, who was in charge of recovering evidence.

(Emphasis added.)

The State argues that this finding is incorrect because the police did not "seize" any

evidence. According to the State, the police merely obtained possession when the APD officers released the evidence into their custody.

The record indicates that "the actual search and recovery was accomplished by Adult Probation Division[;] ... [but] it was already arranged that whatever contraband was found by [sic, presumably APD,] the Honolulu Police Department would take *possession* of it[.]" (Emphasis added.) Although the court's finding is imprecise because Carreiro did not testify that HPD could "seize" any contraband found at the residence, the testimony adduced at the suppression hearing supports the court's finding considered as a whole.

During the search, according to Officer Carreiro, Palea said "I don't want this place to get messed up. I'll show you guys where the drugs are." It is unclear, however, to whom precisely Palea directed his statements. The following exchange took place between the Prosecutor and Kekauoha:

Q: Who was in charge of recovering the evidence from different locations of the apartment?

A: I was.

Q: What about the stuff, the items that Mr. Palea wanted to show you guys, who recovered those items specifically?

A: The first recovery was Joseph Chu [APD].

Q: That was regarding specifically the items that Mr. Palea wanted to show to you guys?

A: Yes.

Q: When the defendant Palea said I wanted to show something to you or, I guess, you guys, for lack of a better word, was he directing that statement to anybody specifically?

MS. THOMPSON: Objection, calls for speculation as phrased?

THE COURT: Rephrase.

---

14. Officer Carreiro testified to the contrary, that the briefing was an informal meeting to discuss the procedures to be followed during the search, "basically [we were] having some coffee, waiting in the felony room."

15. This took place prior to "confirmation" by Propios, while seated next to Officer Carreiro, that there would be drugs at her residence. *See supra* this section (discussing FOF-15, part (c)).

Q: When the defendant Palea said I wanted to show something to you people or you guys, was that in response to any question that you had—may have put to him?

A: What happened was that *Louis Palea and another police officer, I believe it was Officer Mauhu [sic], I'm not certain, had both come in from the direction of the bedroom and the officer told me that Palea wanted to show something.*

So then I asked Palea what is this that you want.

Then he said that, he confirmed that he wanted to show something.

So then I directed the officer and I called Joseph Chu and told them to go in the back room and directed them to all go there.

(Emphasis added.) The highlighted segment could be read to support an inference that the police played a greater role in the search than merely providing security. Although APD officer Chu physically recovered the items, the apparent fact that HPD officer Mapu and Palea were alone in the bedroom for unexplained reasons raises a question as to whether Mapu somehow influenced Palea's "voluntary" revelation.

Officer Carreiro also testified that he followed Palea into the bedroom after Palea stated that he wanted to show them where the drugs were located. Officer Carreiro explained that as "the lead case agent," he accompanied co-defendant Palea and APD officer Joseph Chu into Palea's bedroom "because *I'm conducting—I'm going to end up conducting some investigation,* you know, from a police standpoint." (Emphasis added.)

The State also argues that the second to the last sentence of FOF–19 is erroneous because the testimonial evidence was "embodied in a question ... with the obvious suggestion that the police were present at the search for their own independent purposes." The testimony in question reads as follows:

Q: Basically, all this, in your experience as a Police Officer, is meant not only then to secure contraband, but also evidence of other crimes being committed; isn't that correct?

A: Evidence of the crimes committed in connection with the contraband.

The finding is not clearly erroneous because the police understood that they would secure any evidence seized by the APD officers. Therefore, a court could infer that Officer Carreiro understood that he would secure evidence of other crimes, if that evidence was seized by APD officers as a violation of probation.

Although FOFs 5, 15(b), and a portion of FOF–17 are clearly erroneous, these errors are harmless. Finally, FOFs 8, 15(a), 15(c) and 19 are contradicted by direct testimony, but these findings nevertheless reflect reasonable inferences drawn by the trial judge based on a determination of the credibility of the witnesses and the weight of the evidence.

### 2. Conclusions of Law

The State appeals three conclusions of law (COL). The first is COL–2:

In the present case, specific and articulable facts supporting a reasonable suspicion were presented to HPD by Adult Probation. However, with regard to probationers, a search or seizure arising from such suspicion is subject to a condition based on statute. The condition permits warrantless searches of a probationer's residence by probation officers and seizure of any contraband found thereby by probation officers. Police officers are therefore not authorized under this condition to conduct warrantless searches of a probationer's residence. Such warrantless searches are the province of the Adult Probation Department.

The conclusions herein are correct because police officers cannot conduct probationary searches. Under the analysis in sections II.A. through C., *supra,* the police may participate in such a search provided that the search is for legitimate probationary purposes and not designed as a ruse to facilitate the gathering of evidence for prosecution of new criminal acts.

The State also appeals COL–5 and 6, which state:

> 5. In the present case, the police and Adult Probation Department worked in concert to actively create a new case against both Propios and Palea. By using the warrantless search and seizure procedure relegated exclusively to Adult Probation for correctional supervision purposes, the police furthered a criminal investigation. Carreiro knew that Propios was the target of investigation involving Class C felonies and that any evidence recovered at her residence could be used to charge her accordingly. *Adult Probation specifically informed him in advance of the challenged search that such evidence would be in the form of contraband to be found on the premises.*
>
> 6. No correctional purpose could be served by the April 2, 1991 search initiated by Adult Probation. By their own admission, Adult Probation had grounds for revocation of Propios'[s] probation prior to the search. This Court concludes that the search was initiated to gather evidence of further criminal activity and therefore exceeded the rehabilitative scope for warrantless searches allowed by statute.

(Emphasis added.)

Although termed a conclusion of law, COL–5 is actually a collection of factual findings that sets the stage for COL–6. In any event, most of the information in COL–5 is supported by the trial court's FOFs. The judge erroneously determined in COL–5 that "Adult Probation *specifically informed* [Officer Carreiro] in advance of the challenged search that [evidence of illegal drug use and promotion] would be in the form of contraband *to be found on the premises.*" (Emphasis added.) The record only contains sufficient evidence to support a finding that the APD informed Officer Carreiro that contraband would *likely* be found on the premises;[16] there is no specific evidence that Kekauoha informed Carreiro such evidence would *certainly* be found. This error, however, is harmless.

Like the statements in COL–5, the second sentence of COL–6 is actually a finding of fact. This sentence was apparently intended to bolster the conclusion of law set forth in the first sentence; however, the purported existence of "grounds for revocation of Propios'[s] probation" does not provide the sole basis for the court's ultimate conclusion, as declared in the third and final sentence of COL–6. Because a valid correctional purpose existed justifying the probationary search, the finding in the second sentence of COL–6 is erroneous.[17] In any event, however, this error is either harmless or indicates that the trial court reached the right result for the wrong reasons. *See State v. Pinero*, 75 Haw. 282, 290, 859 P.2d 1369, 1373 (1993) (citing *State v. Taniguchi*, 72 Haw. 235, 240, 815 P.2d 24, 26 (1991)). The fundamental conclusion stated in the closing sentence that "the search was initiated to gather evidence of further criminal activity" is sufficiently supported by FOFs 8, 9 and 15.

Although a probation officer is primarily a helper and a monitor, *see, e.g.,* HRS § 806–73 (Supp.1992),[18] it is also true that he or she is an enforcer with "the powers of a police officer[.]" *Fields,* 67 Haw. at 280, 686 P.2d at 1388–89 (citing HRS § 806–73). Nonetheless, the probation officer's "reason for intruding into the private world of the probationer, *unlike that of the police officer,* is [the probationer's] demonstrated need for correctional supervision" and the fact that her "desired rehabilitation ... is dependent upon the [probation officer's] ability to gain a thorough understanding" of her circumstances. *Id.* A search for illicit drugs

---

16. *See* discussion of FOF–17 *supra* section II.E.1. (discussing evidence supporting a reasonable inference that the police were aware that drugs would likely be found on the premises).

17. Notwithstanding the existence of two positive urinalysis tests, indicating drug use in violation of the terms of probation, a valid correctional purpose remained to justify the probationary search. *See supra* footnotes 2, 3 & 6 (discussing the adequacy of the two urinalysis tests, and the statutory basis available for revocation).

18. HRS § 806–73 provides, in pertinent part, **"Duties and powers of probation officers.** A probation officer ... shall use all suitable methods to *aid the defendant and to bring about improvement in [her] conduct and condition."* (Emphasis added.)

may well serve one of the twin goals of probation, the protection of the public[, ... but] the pertinent legislative command is that the condition further the other objective, the rehabilitation of the offender, and that it be neither too restrictive of the offender's liberty nor incompatible with [her] freedom o[f] conscience.

*Id.* at 278, 686 P.2d at 1387.

There is sufficient evidence in the record to support the conclusion that APD and HPD "worked in concert to actively create a new case against ... Propios" by undertaking a warrantless search in order to: (a) find and seize evidence the probationer had indicated would likely be found; then (b) prosecute Propios using that evidence; and finally (c) revoke her probation. Because the subjective purpose of the warrantless search, as correctly determined by the trial court, was to investigate and prosecute criminal activity rather than to restore Propios to society through rehabilitation, the search "was broader than necessary to satisfy the need which legitimized departure from the warrant requirement in the first place." *Kaluna*, 55 Haw. at 363, 520 P.2d at 55.

The search was improper not because of mere police participation, but because it was actuated by an intent to pursue future criminal prosecution rather than a desire to advance otherwise valid probationary purposes. Therefore, we affirm the circuit court's order granting Propios's motion to suppress the evidence.

### III. *Conclusion*

Although several of the circuit court's FOF were clearly erroneous, we conclude that these errors were harmless because there is sufficient evidence in the record to support the court's conclusion that the search exceeded the rehabilitative scope for warrantless searches allowed by statute. Accordingly, we affirm the order suppressing evidence obtained during the purported probationary search.